# WHEELING.

## HORN *v.* STAR FOUNDRY COMPANY.

Submitted January 31, 1884—Decided March 15, 1884.

1. An insolvent debtor, whose lands are about to be sold by commissioners of sale to pay liens upon them makes an arrangement with a third party, whereby he agrees to use his best efforts at the public sale to depreciate the price, which a certain lot a part of the land to be sold may bring, so that this lot may be bought by this third party at a grossly inadequate price, and in consideration thereof this third party agrees to convey to this insolvent debtor a portion of said lot for the excess, which may be paid for this lot over one thousand dollars, or to convey it to the debtor for nothing, if it be purchased for as little as one thousand dollars. This contract is fraudulent, and the parties to it are in *pari delicto*, and the maxim *"in pari delicto potior est conditio defendentis,"* that is, "where both parties are equally guilty the defendant shall prevail," should be applied in such cases, and a court of equity should refuse specifically to enforce this contract at the instance of the fraudulent debtor after the public sale of this lot, though the fraudulent debtor has complied with all the terms of the contract, and has depreciated the price which this lot brought and the lot has been purchased by such third party at a grossly inadequate price. (p. 532, 540, 543.)

2. A party purchases land of another and the vendor suggests, that the contract of sale and the conveyance shall be made in the name of and to a third party, who knows nothing about the transaction, for the purpose of hindering, delaying and defrauding the creditors or the real vendee, such contract is fraudulent

and against public policy, and the parties to it are in *pari delicto*,
and the maxim *"in pari delicto potior est conditio defendentis"*
should be applied to the case ; and such fraudulent contract can
not be enforced in a court of equity by either the real or nominal
vendee against the vendor, though all of its terms have been
complied with on the part of the vendee and possession of the
lot given by the vendor.   (p. 547.)

GREEN, JUDGE, furnishes the following statement of the
case:

At June rules, 1881, T. J. Horn filed his bill in the circuit
court of Wood county against the Star Foundry Company, a
corporation, and also against certain stockholders of said·
corporation as partners under the name of the Star Foundry
Company.   The bill states, that prior to February 23, 1881,
the individual defendants proposed to engage in the foundry
business in Parkersburg, and to become a corporation under
the name of the Star Foundry Company.   They obtained a
certificate of incorporation on January 20, 1881, which was
duly recorded on March 30, 1881.   Between February 1,
1881, and February 18, 1881, one S. J. Horn, who owned a
certain lot of land in Parkersburg agreed to sell to the said
Star Foundry Company said lot, except a portion of it known
as the old carrriage factory lot, for one thousand dollars.
But there was then pending in the circuit court of Wood
county a suit in chancery at the instance of one John W.
Perry against said S. J. Horn and divers other persons prin-
cipally creditors of S. J. Horn by judgments and deeds of
trust, in which suit a decree was entered on April 19, 1879,
directing the whole of said lot to be sold by commissioners,
and they had advertised said lot to be sold at public sale on
February 23, 1881, of all of which the said Star Foundry Com-
pany had notice.   And it was agreed between said S. J.
Horn and said Star Foundry Company, that the latter should
buy -the whole of this lot at this sale, and as soon as it got
a deed therefor it was to re-convey to S. J. Horn all of this
lot except the part for which they had agreed with him to
pay one thousand dollars on February 17, 1881, a few days
before the sale.   The said S. J. Horn in said agreement stip-
ulated, that he would prevent any person from making a bid
upon said lot when offered for public sale by the commis-

sioners, except the Star Foundry Company, so that the company could buy the whole lot for one thousand dollars. But it was agreed, that if any one should bid against the Star Foundry Company and it was thereby compelled in order to get the whole lot at this sale to bid more than one thousand dollars, S. J. Horn should then pay for the part, which the company agreed to re-convey to him, the excess which it had to pay over one thousand dollars, the payments to be on the same terms as those advertised by the commissioners; and that subsequently and before the day of sale at the request of said S. J. Horn the Star Foundry Company agreed to make the conveyance to the plaintiff, T. J. Horn, instead of to said S. J. Horn; that on the 23d day of February, 1881, these commissioners according to this advertisement did offer the whole of said lot of S. J. Horn for sale publicly, one fourth to be paid in cash and the balance in three equal instalments payable in six, twelve and eighteen months, and it was knocked down to the Star Foundry Company at one thousand two hundred and fifty dollars.

The plaintiff in his bill says he is informed and believes, that the only reason the lot brought at this sale more than the one thousand dollars, which was agreed on, was, that different officers of the Star Foundry Company by mistake bid against each other. The bill then makes this singular allegation: "At the time of said sale said S. J. Horn was also present and in *good faith* done and performed all that he had agreed to do in preventing bids upon said property, so that the defendant (the Star Foundry Company) secured said lot by *formal* purchase although several persons were present, who would have bid a much larger sum for the whole of said lot of ground had they not been requested by said T. J. Horn to desist from bidding, or in any manner interfering with the purchase thereof by the defendant, the Star Foundry Company; that the sum of one thousand two hundred and fifty dollars would have been a mere nominal price for the whole of said lot; that the portion which it was agreed the defendant, the Star Foundry Company should convey to the plaintiff, the old carriage factory lot, was at that time worth at least five thousand dollars; that there was a stone foundation and boiler stack upon the same worth at least two thou-

sand dollars, and this old carriage factory lot was so situated as to be highly desirable and valuable for a manufacturing site; that by this contract with S. J. Horn he was also to facilitate in every way he could an early confirmation of the sale to the Star Foundry Company by the circuit court of Wood county, which agreement in this respect he also kept by making no objection to the confirmation of this sale of the whole lot to the Star Foundry Company; but on the contrary he advised and facilitated the confirmation of this sale in every way he could in order that the plaintiff, T. J. Horn, might be speedily invested with the title to said carriage factory lot." The bill states, that two days after this public sale and before the confirmation of the sale then made, the Star Foundry Company executed "a memorandum in writing embodying in brief the substance of the contents before fully stated." This was done on the demand of said S. J. Horn as agent of the plaintiff, T. J. Horn.

This memorandum filed with the bill stipulated, that the Star Foundry Company should sell to the plaintiff, T. J. Horn, of Wilmington, Delaware, this old carriage factory lot, if the sale of the whole lot to the Star Foundry Company was confirmed at the then session of the circuit court of Wood county. The terms of the sale to be that T. J. Horn, the plaintiff, was to pay the Star Foundry Company therefor two hundred and fifty dollars, as follows: One fourth cash down, the balance in three equal payments in notes at six, twelve and eighteen months with interest secured by a lien on said property. This agreement was dated February 25, 1881, and was signed by the president of the Star Foundry Company, and at the foot of it was this memorandum: "This agreement to be carried out within sixty days from this date. After that time to cease—becomes void." It is alleged in the bill, that this memorandum was added at the foot of this agreement by a member of said Star Foundry Company after the memorandum signed by the president of said company had been delivered to S. J. Horn, the plaintiff's agent; and the plaintiff says it constitutes no part of the agreement.

The sale was confirmed during the session of the court, and on March 16, 1881, under the decree of said court, the com-

missioner made a deed for the whole of said lot to the Star
Foundry Company. But the Star Foundry Company has
refused to convey to the plaintiff, T. J. Horn, the part of
said lot known as the carriage factory lot according to their
agreement, though he through his agent S. J. Horn has been
always ready and willing to carry out the contract on his
part by making the cash payment of sixty-two dollars and
fifty cents, and executing the three notes provided for in this
written contract. The plaintiff, T. J. Horn, through his
agent, S. J. Horn, offered to pay the Star Foundry Company
the full sum of two hundred and fifty dollars with interest
from February 23, 1881, if it would promptly execute said
deed for this carriage factory lot, but it refused to accept the
money or make the deed. And he afterwards, on April 26,
1881, made a formal tender according to this written agree-
ment by his agent, S. J. Horn, of the cash-payment of sixty-
two dollars and fifty cents and the three notes called for by
said agreement, and demanded the deed. But though the
Star Foundry Company received this sixty-two dollars and
fifty cents and these notes it still refused to make this deed.

The bill alleges that under this purchase the plaintiff took
possession of and put improvements on said carriage factory
lot to the amount of six hundred dollars, and that the Star
Foundry Company not only refuses to make said deed, but
threatens to sell said carriage factory lot to others.

The plaintiff claims that the Star Foundry Company un-
der these facts holds the legal title of this carriage factory
lot for his use, and if this be not so, he has at least a right
to ask for the specific execution of that contract in writing
for the sale of this lot. The bill prays, that the Star Foun-
dry Company be compelled to execute and deliver to the
plaintiff a deed for said carriage factory lot, and that the
cause may be referred to a commissioner to ascertain what
damages the plaintiff sustained by reason of this failure of
the Star Foundry Company to make this deed promptly ac-
cording to said contract, and that it be enjoined and restrained
from selling or encumbering this carriage factory lot, and
for general relief. This bill was sworn to by S. J. Horn, and
the injunction prayed for was awarded. The defendant, the
Star Foundry Company filed a general demurrer to the bill,

and the other defendants filed a general and special demurrer, in which demurrers the plaintiff joined.

The Star Founday Company also filed its answer in which it states, that it has been a corporation since January 21, 1881, and that the transactions spoken of in the bill occurred with it alone and not with any of the other defendants individually or as partners.    It admits its offer of one thousand dollars for the property named in the bill, which it wanted. This offer was made to S. J. Horn though the company admitted that it knew that it could not be sold by him, but that a decree had been rendered to sell this property by commissioners to satisfy liens on it exceeding twelve thousand dollars, which was more than the property to be sold was worth, and it also knew that S. J. Horn was insolvent.    But there had been before the sale "no contract in writing or other thing done to bind the bargain," and at the sale it bought the whole lot named in the bill, including the carriage factory lot, and when S. J. Horn came to claim the carriage factory lot at two hundred and fifty dollars the respondent, though "it proposed to keep the whole property, yet it desired not to disappoint S. J. Horn, and as it knew his habits of procrastination, it executed the memorandum in writing named in the bill."    The memorandum or a part thereof was a part of this agreement, and was added with the consent of S. J. Horn before this memorandum was delivered to him.    It denies in this answer, that until this bill was filed it knew what S. J. Horn had done, or that he claimed to have done anything to prevent other parties from bidding at this public sale, or that it made with him an arrangement, whereby he was in any way to exert himself to prevent this property from selling at its full value and at the highest price any one would give for it.    Until the memorandum of the agreement named in the bill was made, two days after the sale the respondent never heard that it was to be made to the plaintiff, T. J. Horn.    Its dealings had been altogether with S. J. Horn individually.    The answer alleges that since this memorandum was made, the defendant has reason to believe, and does believe that S. J. Horn is the real party in interest in this suit, and that this paper had injected into it the name of T. J. Horn, his brother, to enable S. J. Horn to hinder,

delay and defraud his creditors. It admits that the factory lot is now worth more than two hundred and fifty dollars, but says that since the sale property generally has advanced in price in Parkersburg. The defendant even avoided saying what this lot was worth to it. It does not admit that it gave possession of this lot to the plaintiff or his agent, S. J. Horn, but it fails to deny in a proper manner, that with its knowledge he took possession of it and put improvements on it, though the answer is so written as to produce the impression, that it was not so taken possession of and improved. It denies that any tender was made to it as alleged in the bill till after the expiration of said sixty days from the time the contract was made, and the notes then offered were signed by T. J. Horn by his attorney in fact, S. J. Horn, when he had no authority at that time to sign the name of T. J. Horn. Said S. J. Horn wished the business to be then done in the name of his brother, T. J. Horn, in order to defraud the creditors of S. J. Horn, who was insolvent. But respondent refused to make the deed, and regarded itself as under no obligation to complete this contract as more than sixty days had elapsed since it was made.

This answer was sworn to by the president of the Star Foundry Company. The plaintiff filed six exceptions to it. I need not state them all. One was, that it did not respond to the allegations of the bill specifying the negotiations that led to the signing of this memorandum of sale sued on. This exception was well founded. The answer did evade the responding to these specified negotiations. Another exception was, that this answer did not respond to the distinct allegations in the bill that the plaintiff by his agent took possession of that carriage factory lot and improved it with the knowledge of the defendant. This exception was well taken, for the answer did evade responding to these allegations. On December 24, 1881, the court overruled said demurrer and all of said exceptions to said answer.

Numerous depositions were taken, the principal witnesses being the parties to the suit. These depositions occupy a hundred pages of the printed record. They are to a considerable extent contradictory, and a number of them are taken to disprove the tender made by S. J. Horn spoken of

in the bill, and whether, when it was made, S. J. Horn had
or had not the authority to sign the name of his brother, T.
J. Horn, who resided in Delaware, to the bonds, and to prove
other matters, which I deem of no importance in the view I
take of this cause.   The material facts, on which I base my
opinion, and which alone I deem necessary to state which
were proved by or which can be fairly inferred to exist from
this mass of evidence are as follows:   1. S. J. Horn was in-
solvent.   2. The liens on his real estate in Parkersburg ex-
ceeded fourteen thousand dollars, and the property was
known, before the sale was made, to be insufficient to satisfy
them.   3. The lot purchased at this sale by the Star Foundry
Company was purchased at a grossly inadequate price.   4.
S. J. Horn, the brother of the plaintiff, did all he could to
cause this lot to be sold at as low a price as possible.   5. He
had the understanding with the Star Foundry Company
stated in the bill, that he was to depreciate this property at
the sale, and that if the Star Foundry Company became the
purchaser of the whole lot, it would let him, S. J. Horn,
have that portion of it known as the carriage factory lot for
the excess, which the Star Foundry Company might give for
the whole lot over one thousand dollars, no matter how small
that excess might be.   6. This agreement was so far carried
out, that the memorandum named in the bill was signed by
the president of the Star Foundry Company, and when he
signed it, he suggested to S. J. Horn, that if the sale was
made to him, his creditors, who had liens on his land and
whose claims remained unsatisfied by the commissioners'
sales, would again at once have liens on this carriage factory
lot, and that he, S. J. Horn, could not borrow money on it
to build a carriage factory as he intended, and on this sug-
gestion with the approbation of S. J. Horn and with the pur-
pose of delaying, hindering and defrauding the creditors of
S. J. Horn the memorandum of sale was drawn as a sale on
certain terms to T. J. Horn, a brother of S. J. Horn, who
resided in Delaware, which was done with the avowed pur-
pose of delaying, hindering and defrauding the creditors of
S. J. Horn, so expressed and understood by both parties at the
time.   7. This carriage factory lot thus fraudulently agreed
to be sold for two hundred and fifty dollars was really worth

much more, probably not less than one thousand dollars, which was the reason, that the Star Foundry Company refused to carry out the agreement; and the fact, that the company doubted whether S. J. Horn had the authority to sign the name of his brother to the bonds given for the purchase-money, was a pretext to avoid complying with the contract of sale, they well knowing that the real sale was to be made to S. J. Horn, and that the conveyance was to be made to T. J. Horn only to deceive and defraud others, and that they could easily avoid this pretended difficulty about the authority of S. J. Horn to sign his brother's name, as any other name could be as well signed, the real security relied upon by the Star Foundry Company being neither the insolvent purchaser in fact, S. J. Horn, nor the non-resident nominal purchaser T. J. Horn, but the lien which was to be retained on the carriage factory lot, which was a most ample security for the paltry sum of two hundred and fifty dollars. 8. T. J. Horn, the plaintiff, knew nothing whatever of the purchase of the carriage factory lot, when it was made or when the memorandum of sale was made to him, the real consideration being not simply this two hundred and fifty dollars, but the fact that through the active services of S. J. Horn in using his power as the owner of the lot, which they had purchased at public sale for one thousand two hundred and fifty dollars they had obtained it at a price far below its real value, and that these services had been rendered with an understanding had before the sale with S. J. Horn, that they were to be rendered as the whole or a part at least of the consideration for the conveyance of this carriage factory lot. 9. S. J. Horn did, after this memorandum of sale was made, and after the confirmation of the sale by the court enter into the possession of said carriage factory lot with the knowledge and tacit consent of said Star Foundry Company, and did expend upon it a considerable amount of his own money in permanent improvements. 10. It was his purpose to build on it a brick carriage factory, and the brick, which he intended to use, belonged to him, S. J. Horn, and did not belong to T. J. Horn, who knew nothing of these transactions in particular. 11. T. J. Horn was actively co-operating with his brother, S. J. Horn, in this and other schemes to defraud his

creditors and to enable him the more effectually to do this had executed to him a power of attorney, which among other things provided, that S. J. Horn might transact any business for him in West Virginia or Ohio, and might sign for him any bond or note in his name, receive any deed for him, sell or *encumber* any real estate that he, T. J. Horn might own in either of said States, and in his name might make any deed or deed of trust conveying or encumbering said real estate, which most ample power of attorney closes thus: "Giving and granting my said attorney full and *irrevocable* authority to transact any and all business in my name, place or stead as my attorney in fact, hereby ratifying and confirming all acts, that my said attorney may have done for me heretofore, and acknowledging a former power of attorney of the same powers as are herein given." 12. S. J. Horn had been in the habit of purchasing lands for himself and having the conveyances made to his non-resident brother, T. J. Horn, who so far as the evidence shows, owned no property in this State except such as had been conveyed to him at the instance of S. J. Horn, and which really belonged to S. J. Horn; and the apparent design of this irrevocable power of attorney was, not to enable T. J. Horn to transact his business by any agent in this State, but to enable S. J. Horn to transact his business in the name of his non-resident brother, and thus to delay, hinder and defraud his creditors.

On these pleadings and evidence the circuit court on April 14, 1882, entered this final decree:

"This cause came on again this day to be heard on the bill and exhibits filed therewith, the process executed on the defendants, the cause regularly set for hearing as to all the defendants, the former orders made in the cause, the papers heretofore read therein, the answer of the incorporation, the Star Foundry Company, with general replication thereto, the depositions taken and filed in the cause on behalf of the defendants as well as on behalf of the plaintiffs, on the motion of the defendants to dissolve the injunction, the plaintiff, by counsel, waiving the filing of answers by the individual persons named as defendants, and was argued by counsel for plaintiff and the defendants. On consideration

whereof, the court is of opinion that the plaintiff is not entitled to the relief prayed for by him. It is therefore adjudged, ordered and decreed that the injunction heretofore awarded against the defendant in this cause be and the same is hereby dissolved; that said plaintiff's bill be dismissed, and that the defendants recover from the plaintiff their costs about their defence in this behalf expended, with leave to sue out execution therefor. And it appearing to the court that the defendant, the Star Foundry Company, has brought into court with its answer the sixty-two dollars and fifty cents in cash and the three notes of sixty-two dollars and fifty cents each referred to in the bill as having been offered to the said company as a tender under the contract sued on in this cause, which three notes are now attached to the disposition of W. W. Van Winkle in this cause, it is ordered that the clerk of the court restore to the plaintiff the said sixty-two dollars and fifty cents in cash, upon the execution by himself, or his agent for him, to said clerk of a receipt therefor; and that said plaintiff also have leave to withdraw the said three notes on leaving with the clerk and with the file in this cause, copies thereof, attested by said clerk; and the said plaintiff also has leave to withdraw the contract filed as Exhibit No. 2 with the bill on leaving in the file a copy thereof duly attested by the clerk."

From this decree the plaintiff, T. J. Horn, has obtained an appeal and *supersedeas* from this Court.

*James Hutchinson* for appellant.

*Van Winkle & Ambler* for appellee.

GREEN, JUDGE:

The law question involved in this cause is, whether when two parties enter into a contract the purpose and effect of which is, that something by the terms of the contract is to be done which is contrary to public policy or is fraudulent, and both of the parties to such contract are equally guilty, will a court either of law or of equity enforce such contract? An examination of the authorities shows, that the proper answer to this question is, that as a general rule neither a

court of law or of equity will enforce such fraudulent or vicious contract. The maxim *"in pari delicto potior est conditio defendentis,"* that is, "when both parties are equally guilty the defendant shall prevail," is very generally applicable to such a case.

As a general rule the reason why upon such fraudulent or vicious contract neither the courts of law nor of equity will render either party any relief is, that it is obvious, that in refusing relief to either party in such a case the courts very generally adopt the best rule of discouraging the making of such contracts, and it is for this reason and not because the defendant in such a case has any claim on his own account to any favor from the court, that the rule is generally adopted, that the court in such a case will furnish the plaintiff no redress. But if in a particular case it can be clearly shown, that the observence of the rule that the plaintiff will be furnished no relief in such a case would tend to encourage such fraudulent and vicious practices by really giving effect to the objects, which the parties had in contemplation when such fraudulent and vicious schemes were devised, then the courts will not apply the rule, but will permit such fraudulent plaintiff to recover not because of any favor that the court is disposed to show him, but simply because in such a peculiar case the public policy requires, that such recovery or relief should be had against the fraudulent defendant. It rarely happens however, that public policy requires the courts to render relief to the plaintiff on such fraudulent or vicious contract, as it is obvious that as a general rule a party wishing to commit a fraud or to do or cause to be done something contrary to public policy can be most effectually prevented from making a contract with an accomplice to carry out such fraud or vicious object, if he knows that by so doing he puts himself in the power of such fraudulent and vicious accomplice; and generally if the law will give him no relief against such fraudulent accomplice, though he commits ever so outrageous a violation of good faith with him, it puts him in the power of his fraudulent accomplice, and thus discourages him in entering into such fraudlent contracts. To show that these are correct views of the law it is only necessary to review the Virginia and West Virginia cases.

. The first Virginia case on this question is, *Austin's Administrator* v. *Winston's Executrix*, 1 H. & M. 32. The syllabus of the case is, "When a transaction between a debtor and his creditor is intended by them both to defraud other creditors of the debtor, but the latter under all the circumstances of the case is not so culpable as the former, it *would seem*, that a court of equity ought not altogether to refuse relief to the debtor, but to apportion the relief granted to the degree of criminality in both parties, so as on the one hand to avoid the encouragement of fraud and on the other to prevent extortion and oppression." The decision in this case was rendered by a divided court, and the conclusion reached by the majority of the court was one, which evidently did not meet with the cordial approbation of even the majority, for Judge Carrington, one of the majority, concludes his opinion thus : "So far as respects myself, it is not to be considered that any principle is here fixed so as to operate as a precedent in other cases. This decree is adopted to fit the present case only ; and it is hoped so gross a fraud may not again be brought before this court." See page 50. In subsequent Virginia cases this case was accordingly not regarded as settling the law, and when spoken of afterwards it was either impliedly disapproved or apologized for, because of the particular circumstances surrounding this particular case. I do not regard it as authority to be followed.

In *Wise* v. *Craig*, 1 H. &. M. 578, the court affirmed a decree of the chancellor but gave no opinion, and we cannot therefore know with any certainty what were really their views. From the argument of counsel in the case we might perhaps infer, that the plaintiff was guilty of no fraud, or that perhaps he might have been unaware of the fraud of the defendant, which was gross. It may at any rate be safely said, that it was apparent that the parties were not *in pari delicto.* Relief was given the plaintiff in that case, but it cannot be said to throw any light, or if any, very little on the question we are considering.

In *Chamberlayne et al.* v. *Temple*, 2 Rand. p. 384, it was decided, that a voluntary or fraudulent conveyance was good between the parties, though made to delay, hinder and defraud creditors. This is in accordance with the almost uni-

form decisions of the courts elsewhere.    See *Lessee of Barton* v. *The Heirs of Thomas Morris*, 15 Ohio R. p. 408; *Tremper et al* v. *Barton, jr.*, 18 Ohio 418; *Douglas* v. *Dunlap et al.*, 10 Ohio 162.    Similar decisions are to be found in other States.    The basis of all these decisions is, that if a grantor in fraud of his creditors makes a deed to a grantee, the courts will regard it as void as to his creditors but good as to the grantor, and as operating to convey the property included in the deed.    It is obvious, that by so holding the courts discourage all such fradulent conveyances, for the party who makes such fraudulent conveyance is by these decisions properly left in a far worse condition than he was, when he engaged in such fraudulent transactions.    If his creditors discover the fraud, the property thus fraudulently conveyed will still be subjected to the payment of the debts of the grantor, and if they should be so unfortunate as not to discover the fraud, still the fraudulent grantor is not benefited by his fraud if the fraudulent grantee chooses to hold the property against him or to claim it under such fraudulent deed, which it is very probable he will do.    It is true, that if he does so, the fraudulent grantee profits largely by such decisions of the court, as he gets the property for nothing not only by defrauding the grantor, but by aiding in defrauding the grantee's creditors.    But the courts must render these decisions not that they may aid such fraudulent grantee, who if it is possible is in the transaction more base than the fraudulent grantor, but simply to protect the public against frauds of this character, and this protection is best furnished by placing the fraudulent grantor in the complete power of the fraudulent grantee.    Doubtless these decisions have prevented many conveyances to delay, hinder and defraud creditors, while decisions, which declared such fraudulent deeds between the grantor and grantee void would have greatly encouraged the making of such deeds.    The creditors being perhaps unable to discover the fraud would be delayed and hindered, while the fraudulent grantor being capable of exposing the fraud at any time could at his pleasure cause the deed to be declared void, and have the property conveyed restored to him. The courts have said, that rather than thus encourage such frauds it is better to leave the grantor in the power of his

accomplice, the fraudulent grantee, though by so doing this fraudulent grantee may be profited.

The next Virginia case on this subject is, *Starke's Ex'or* v. *Littlepage*, 4 Rand. 368. This case is an excellent illustration of the law on this subject as we have stated it. The syllabus of this case is: "The rule *in pari delicto potior est conditio defendentis*, does not apply, where the policy of the law requires that a fraudulent or vicious conveyance should be enforced, and therefore when a debtor makes a fraudulent conveyance the fraudulent grantee may enforce such conveyance in a court of law, and the debtor will not be allowed to defeat the claim by proving the fraud." This case was decided by a divided court, one of the judges (Coalter) holding, that the maxim above quoted, which is of such general application, ought to be applied even in such a case, and if such grantee is forced to be the plaintiff, which he thinks can rarely occur, the court ought not to grant him relief by enforcing such fraudulent contract; but Judge Green, who delivered the opinion of a majority of the court thought otherwise. In that case the debtor, whose slaves were sold under an execution, furnished money to a friend to buy them at the sheriff's sale. The friend was to buy them in his own name, and the execution was returned satisfied by the sale of these negroes to this third party. He at once according to his understanding with the debtor gave the negroes to the debtor, but as they would have been liable to be levied on by other judgment-creditors of this debtor, to avoid this, the debtor executed to this friend a memorandum certifying, that he held these slaves on certain terms, which he had agreed on with the owner of them, (his friend who had nominally bought them at the sale,) and that he was responsible to him for their hire. This memorandum was renewed every five years. The evident object of it being, that if any judgment-creditor of this debtor levied on these slaves the debtor might say he hired them of this friend, and this friend could satisfy every one that he was the owner of these negroes by showing the return of the sheriff, that he had bought them at this sheriff's sale, and by this memorandum that the real owner of them, the debtor, was not the owner of them but hired them.

This pretended owner of these slaves died leaving among his papers this memorandum showing, that the debtor who had possession of these slaves acknowledged him as the owner of them, and thereupon his personal representative brought suit for them. But the debtor, the defendant in this suit proved, that these slaves had been bought with his own money, and that his friend to whom they were knocked down had agreed to let him have them, and this memorandum was from time to time renewed by him acknowledging that he was not the owner of these slaves, and that it was done by him as well as by the pretended purchaser of these slaves, simply with a view of delaying, hindering and defrauding the creditors of this debtor. The court decided, that though the decedent was *in pari delicto* with the defendant, yet the executor of this decedent should recover these slaves of this fraudulent debtor.

This decision it seems to me was right, for had it been otherwise decided this fraudulent debtor would by this arrangement have defeated and defrauded his creditors, and yet by relying on his own fraud proving it he would still have retained his slaves and had the use of them as if the owner. Though it but rarely happens, that the court will enforce a fraudulent contract in favor of a plaintiff, yet as Judge Green in his opinion in this case says: "If it be necessary, in order to discountenance such transactions, to enforce a fraudulent contract at law or relief against it in equity, it will be done though both the parties are *in pari delicto*." See p. 372.

It is admitted, that as a general rule the court will not aid a plaintiff, a party to such fraudulent contract, either to enforce it at law or to be relieved from it in equity, because in refusing to do so in almost all cases it most effectually discourages such fraudulent transactions; but in particular cases as this one in 4 Rand. it is obvious, that to refuse to enforce this fraudulent contract would be to encourage such fraudulent arrangements, as such refusal would have made the fraudulent scheme of the debtor a perfect success. It is true this could only be defeated by giving to the fraudulent plaintiff in that case these negroes, though he had never paid a cent for them. But this is better in the view of the courts than by holding otherwise to encourage and make successful

such frauds. In such case it is only the public interest, which the courts regard, and they care nothing for the interest of the parties to such fraudulent arrangements. If such frauds are discouraged, the courts are indifferent as to which of the fraudulent parties to such arrangements either suffers or gains; neither of them ought to have any standing in a court of law or equity. The courts decide as they must in favor of one of the parties, but their decisions are in no manner affected by what is just and right as between these fraudulent parties, but only by what is best for the general public.

A few other cases have arisen, in which courts of law or of equity have enforced such fraudulent contracts, because their enforcement was for the public good, as in such peculiar cases such fraudulent transactions were most discouraged by such enforcement. As examples of this character I may refer to *Montefiori* v. *Montefiori*, 1 Blacks. R. 363. In this case a note was given by A. to his brother in order, that he might pass himself for a wealthy man, and thus succeed in marrying a certain lady. After the marriage the obligor in this note reclaimed this note, and the husband would not give it up. The matter was referred to arbitrators, who decided that the note should be surrendered as nothing was really due upon it. But despite this award the husband refused to give up the note. A motion was made to set aside the award by the husband, though the husband, who held this note, was as guilty of the fraudulent transaction, out of which it arose, as the obligor in the note. The basis of this decision seems to be, that this note was regarded as null and void by the courts because it originated in a fraud. But such decision would greatly encourage frauds of this character. The marriage having been promoted by such fraud, and having been consummated, it could not be set aside, and if this fraudulent note could not be enforced, the result would be that such frauds could be practiced with perfect impunity by both the parties engaged in the fraudulent transaction. The party seeking the wife would procure her by such fraud, and his accomplice, if not compelled to pay the note, would in no manner be prejudiced.

Upon precisely the same ground the case of *Gay* v. *Wendem*, 2 Freem. Rep. 101, was decided. A brother gave to

his sister one hundred and fifty pounds sterling upon her marriage in order to promote the same, and she gave her bond to him privately to return this sum. The husband died without issue, and then the brother sued the sister upon this bond. She filed a bill to be relieved from the payment of this bond, on the ground that the whole transaction was designed as a fraud on her late husband by imposing on him the belief, that she was worth more than she really was. The court relieved her, notwithstanding she was a party to the fraud. It it had not, such frauds could be practiced with impunity, and marriages could be consummated because of such frauds to the great detriment of the public. For a like reason a bond or contract for the sale of an office will be relieved against in a court of equity. But with a very few exceptions based on the peculiar character of the contract or the peculiar circumstances of the particular case the courts hold, that no relief should be given either in a court of law or in a court of equity, where the plaintiff bases the relief he asks on a fraudulent contract or a contract contrary to public policy, and in which he is equally guilty with the defendant.

The next Virginia case bearing on the question which we are discussing is *James* v. *Bird's Adm'r*, 8 Leigh 510, in which it was held, that a party, who to hinder and delay his creditors fraudulently conveys his property to another, can not except under peculiar circumstances maintain a bill in equity to rescind the contract. The grantor and grantee being generally *in pari delicto*, neither is entitled to come into equity. This case alone is I think conclusive of the case before us. The plaintiff in this case has no more pretence for asking a court of equity to enforce this fraudulent contract, which he asks to be enforced, than the plaintiff in that case had a right to ask the rescission of the fraudulent contract appearing in that case; both contracts were made for the obvious purpose of hindering, delaying and defrauding the creditors of the plaintiff, and in neither case is there any pretence, that the debtor had not voluntarily and without any opposition on the part of his accomplice entered into the fraudulent contract; and the well established maxim *in pari delicto potior est conditio defendentis*, was justly applicable.

In the case of *Terrell* v. *Imboden et als.*, 10 Leigh 321, the

facts are, that "the obligor in a bond secured by a deed of trust for the benefit of his creditors makes a deed transferring the bond and deed of trust for the benefit of his creditors. Afterwards at the request of the obligor, the obligee signs a receipt, that on the day of the date thereof he received the amount of the bond. The bond was in fact executed without consideration, and the receipt was in fact without any payment. The creditors for whose benefit this bond was assigned had no notice of its being without consideration till after the assignment; but the obligor knew of the assignment when he took the receipt. It was held, that the creditors for whose use this fraudulent bond was assigned had a right to enforce its collection by a sale of the property, which had been conveyed to secure it; and an injunction granted to restrain such sale was properly dissolved. This case illustrated the principle which I have laid down, that generally no court will enforce a fraudulent contract in a case where both plaintiff and defendant are *in pari delicto.*

This principle is also well illustrated in *Owen* v. *Sharp,* 12 Leigh 427, where it was decided that when "one makes a fraudulent bill of sale, absolute on its face, of a purchase in order to protect his property from his creditors, but there is a secret trust, that the grantee shall hold the property for the benefit of the grantor's daughters, the daughters can not establish the secret trust in equity and have a decree for the slaves." The reasons assigned by Judge Tucker on page 432 for so holding were very sound and are applicable in this case and lead to the refusal of relief to the plaintiff. In *Harris* v. *Harris's Ex'or,* 23 Gratt. the Virginia cases are reviewed and substantially the same views I have expressed are held by the court.

In *Troup* v. *Wood,* 4 Johns. Chy. 289, it was held that an agreement by the owner of an execution with certain persons to prevent the usual competition at a sheriff's sale is fraudulent. See also *Jones* v. *Caswell,* 3 Johns. Cas. 29, and *Cocks* v. *Izard,* 7 Wall. 559.

The Supreme Court of West Virginia has recently decided two cases which bear upon the question involved in the case before us. In one of them, *Corrothers* v. *Harris, supra,* President Johnson says:

"Upon a careful consideration of the bill we are compelled to say, that, if all its allegations are true, the plaintiff does not commend himself to a court of equity, which loves justice and fairness.   According to the plaintiff's claim what he and his agent, Watson, agreed to do but failed to accomplish, was a selfish scheme to prevent bidding at the trust-sale and to acquire the property at an inadequate price.   The poor owner of the land was left entirely out of the case, his interests were not only not regarded, but according to this claim were plotted against.   If the allegations of the bill were true, and if the grantor in the trust-deed was the plaintiff in the cause, a court of equity would hasten to his relief; but it would be loth to lift its hand in relief of one who had entered into a fraudulent scheme to make the property sell at a low price and thus injure the man whose land was about to be sold, or other creditors, who might lose their debts by the accomplishment of such a fraudulent purpose."

In the other, *Maurice* v. *Devol, supra*, this Court decided (see syl. 6) that relief could not be granted on a prayer in an answer for affirmative relief to one who admits or is shown to have participated in the fraud complained of.   Elsewhere the principles laid down in this last case and which we have laid down have been applied; and it has been held, that, where two persons are engaged in a fraudulent transaction to injure others, neither law nor equity except under very peculiar circumstances will interfere to relieve either as against the other from the consequences.   See *Sims* v. *Tuffs*, 6 C. & P. 207 (25 Eng. Com. L.); *Bolt* v. *Rogers*, 3 Paige 157; *Hawes* v. *Leader Brown*, 111 Cro. Jac. 270, also Yelv. 196; *Steel* v. *Brown, &c.*, 1 Taunt. 381; *Drinkwater* v. *Drinkwater*, 4 Mass. 354; *Carrol, &c.*, v. *Boston Mar. Ins. Co.*, 8 Mass. 515; *Reichart* v. *Castutor*, 5 Binn. 109; *Jackson* v. *Garnsey*, 16 Johns. 191; *St. John* v. *Benedict*, 6 Johns. Ch. R. 111.   The general rule is, as we have seen, courts leave the parties to such a fraud in the attitude in which they have placed themselves without relief to either.   See *Wright* v. *Wright*, 2 Litt. 179; *Surlott* v. *Beddow*, 3 Mon. 109; *Sickman* v. *Lapsley*, 13 S. & R. 224; *Smith* v. *Hobbs*, 1 Fairf. 71; *Sherk* v. *Endress*, 3 W. & S. 255; *Bessey* v. *Windham*, 6 Ad. & El. N. S. 166 (51 Eng. Com. L. R.)

It only remains to apply the law, as we have laid it down, to the facts of the case. In the first place it is alleged in the bill, that the transactions, on which this suit were based, were transactions between the defendant, the Star Foundry Company, and S. J. Horn, who is not a party to the cause. There can be no question, but that these transactions were, as stated in the bill, grossly fraudulent and shameful on the part not only of S. J. Horn, but also on the part of the Star Foundry Company acting through its president. The original contract, as stated in the bill, is substantially this, that S. J. Horn, whose real estate was about to be sold by commissioners under a decree to satisfy liens upon it, should actively exert himself to depreciate at the sale the price which a certain lot in Parkersburg belonging to him should bring, and if he could succeed by his efforts in causing this lot to sell for one thousand dollars, it being worth much more, and if the Star Foundry Company could buy the whole lot at that grossly inadequate price, through the exertions of S. J. Horn, as a consideration for this base service he was to have a portion of this lot, worth perhaps nearly one half of the value of the whole lot, given to him by this Star Foundry Company without his paying therefor any consideration. If however despite his exertions to depreciate the price of this lot it should nevertheless sell for more than a thousand dollars, S. J. Horn was to pay the Star Foundry Company, if it became the purchaser of the whole lot, the excess which the whole lot should sell for over one thousand dollars. And in the bill it is alleged that "S. J. Horn at the time of the sale of this property by the commissioners of sale in *good faith* did and performed all he had agreed to do in preventing bids upon said property, so that the defendant, the Star Foundry Company, secured said lot by formal purchase, although several persons were present, who would have bid a much larger sum for the whole of said lot, had they not been requested by S. J. Horn to desist from bidding or in any manner interfering with the purchase thereof by the Star Foundry Company."

Thus this bill without any disguise or palliation alleges that S. J. Horn committed a grossly fraudulent act, whereby he prevented his own creditors from having their honest

debts paid, and that the .inducement to the commission of this gross fraud was a promise by the Star Foundry Company through its president, that if he would act in this disgraceful manner, and they could buy this property by reason of S. J. Horn's shameful conduct, they would give him a valuable portion of it or sell it to him at a grossly inadequate price. The bill alleges that, by reason of this shameful contract of S. J. Horn the Star Foundry Company bought this lot for the merely nominal price of one thousand two hundred and fifty dollars; and that by the agreement with him in consideration of these services the Star Foundry Company were to convey to him a portion of the lot worth five thousand dollars for the pitiful sum of two hundred and fifty dollars. The bill further states, that before the memorandum of this contract was reduced to writing, the name of T. J. Horn was substituted for that of S. J. Horn and the written memorandum of this agreement signed by the president of the Star Foundry Company is filed with the bill, and on its face it states, as the consideration of the agreement on the part of the Star Foundry Company to convey this portion of said lot, two hundred and fifty dollars to be paid on certain terms, a lien to, be retained on the lot. The great and controlling consideration then for the services of S. J. Horn in enabling the Star Foundry Company to purchase the whole of said lot for a grossly inadequate price is fraudulently suppressed.

I need not take time to look up or cite authorities to show, that this contract was fraudulent and contrary to public policy; for it seems to me to be so obviously of this character, that it is only necessary for any lawyer to read the bill at once to pronounce it unquestionably of this character. But as counsel have cited some authorities to show this I will refer to them. See *Hannah* v. *Fife*, 27 Mich. 172; *Gibbs* v. *Smith*, 115 Mass. 592; *Wooten* v. *Hinkle*, 20 Mo. 290; *Gardiner* v. *Morse*, 25 Me. 140; *Swan* v. *Chorpenning*, 20 Cal. 182. See also *Peck* v. *List et als.*, *supra.* These cases show that this contract would have been regarded as fraudulent, even if its whole purpose had been only to stifle competition in the bidding at this public sale, as it would have been, had it been a sale by the commissioners of the court of property in which S. J. Horn

had no interest.    But as this contract was to stifle competition at a sale of the property of S. J. Horn to pay his liens upon it, this contract made by him was rendered much more obnoxious, as it obviously had also another object universally condemned, this particular object being to delay, hinder and defraud his creditors.

There are in this case as stated in the bill no peculiar circumstances such as could possibly under the law as we have stated it exempt it from the application of the maxim *in pari delicto potoir est conditio defendentis*.    The effect of enforcing such a contract would obviously have been to the encouragement of all such fraudulent arrangements.    For if it had been enforced, both of the parties to this fraudulent arrangement would have effected all that they desired and stipulated for, and both of them would have greatly profited by their fraud. The circuit court ought therefore to have sustained the general demurrer to the bill and dismissed the same at the plaintiff's costs.    The case is in principle undistinguishable from a large number of cases, which I have cited, in which the court has refused to aid the plaintiff in enforcing fraudulent contracts.    The striking peculiarity in the case is that the plaintiff in his bill, sworn to by S. J. Horn, unblushingly states that S. J. Horn made a most base and fraudulent contract, and that he is so dead to all shame as not to perceive that the making of this contract was most disgraceful to him. His allegation that "he in good faith carried out and fulfilled this contract," shows to what extent the practice of frauds has obliterated in his mind the capacity to distinguish between a gross fraud and an act of *good faith*.    The Star Foundry Company according to the allegations of the bill was in the eye of the law just as guilty in making this concontract as S. J. Horn; and if the allegations of the bill are true, there was morally a very slight difference between the conduct of Horn and the president of the Star Foundry Company.    He too was morally and legally guilty of a gross fraud.    The only difference between them morally was, that this fraud was in part to delay, hinder and defraud the creditors of S. J. Horn, and he was under a greater moral obligation to refrain from such an act of fraud than was the president of the Star Foundry Company.

It is true that in their answer the Star Foundry Company deny, that the consideration of their agreement with S. J. Horn to convey to him this carriage factory lot was his promise, that he would exert himself to depreciate the price of the lot, which they wanted, so that it could be bought by them at a grossly inadequate price; and this answer is sworn to by Samuel Stewart, their president, who made the contract. But the answer on its face shows, that the real understanding between the parties before the sale is not truly stated. While this answer does not admit, that there was any understanding between the parties, that, if the whole lot was purchased by the Star Foundry Company, they would convey to S. J. Horn the carriage factory lot, but on the contrary in effect denies that there was any such understanding, yet this answer does admit, that directly after the sale S. J. Horn claimed the carriage factory lot, at two hundred and fifty dollars, and though the Star Foundry Company wanted this carriage factory lot, yet it did not dispute this claim but by its president, who swore to this answer, signed a memorandum agreeing to convey this carriage factory lot as claimed by S. J. Horn for this two hundred and fifty dollars. And what reason is given for this very strange conduct, this agreeing to sell a portion of the lot, which the company had just purchased, and which they wanted badly, and that too at the grossly inadequate price of two hundred and fifty dollars? No reason is given but that it "desired not to disappoint S. J. Horn." How could he have been disappointed, if he had no grounds for expecting the lot to be conveyed to him for two hundred and fifty dollars? But the pretence set up in this answer, that this was the reason for the Star Foundry Company by its president signing this contract, is rendered absolutely ridiculous, when we find the Star Foundry Company resorting to every available device as shown by this answer to disappoint S. J. Horn by preventing his getting this carriage factory lot for two hundred and fifty dollars. The answer in connection with the evidence showing that the Star Foundry Company was not only entirely willing to disappoint the just expectation of S. J. Horn, but was also perfectly willing to take every advantage of him, which they supposed the law would permit.

The answer and the proof disclose another fact not even alluded to in the bill, which of itself would prevent the plaintiff's receiving any relief. This disgraceful fact is that the name of T. J. Horn, the plaintiff, was substituted in the contract for the name of S. J. Horn, the real contracting party, with a perfect understanding between S. J. Horn and the president of the Star Foundry Company, when he signed the memorandum of the contract of sale, that this substitution was made with the sole object of defrauding, delaying and hindering the creditors of S. J. Horn. The suggestion was made first by the president of this company to S. J. Horn, that, if such contract, as he wanted, was made in writing, it would not answer his purposes, as he was largely indebted, and these debts would be liens on this lot, if conveyed to him. S. J. Horn then said to avoid this he would have it conveyed to his brother T. J. Horn, the plaintiff, who was a non-resident of the State. The contract for this sale was then written by a director of the company, who first commenced writing in this contract the name of S. J. Horn, with whom the Star Foundry Company had made this contract, but remembering what had just passed he changed the name to T. J. Horn, and he says himself, it was done at the instance of S. J. Horn and for the express object of defrauding the creditors of S. J. Horn. It is true he does not say it was done to defraud the creditors of S. J. Horn. But he does say it was done "in order to keep S. J. Horn's creditors from coming on the property." And so too the president of the Star Foundry Company does not say it was done for the express purpose of defrauding the creditors of S. J. Horn, but he uses language which clearly shows it was done for this express purpose. And if he did not so regard it when he signed the memorandum to convey this lot to T. J. Horn, it must be because his moral perceptions are as blunted as those of S. J. Horn.

Even had there been no fraudulent purpose in the first contract between these parties, the substitution of the name of T. J. Horn a non-resident of the State, who knew nothing of the transaction, in the place of S. J. Horn the real contracting party with the purpose of delaying, hindering and defrauding the creditors of S. J. Horn would of itself have

been an ample reason why the court should not enforce a specific execution of this grossly fraudulent contract. It is true, that this was done at the instance and request of S. J. Horn. But the suggestion, which led to this fraudulent device, and which put it into the head of S. J. Horn, was made by the president of the Star Foundry Company. And they knew perfectly well, as they depose, the reason why this substitution of the name of T. J. Horn was requested. There was then no sort of pressure upon the Star Foundry Company to assent and aid S. J. Horn in this fraud upon his creditors, and the evidence shows they did it cheerfully. They were in this *in pari delicto* with S. J. Horn, but still being defendants their position in the courts is the better.

I have said that the evidence satisfied me, that the contract set out in the bill as made between S. J. Horn and the president of said company before the day of sale, was substantially as stated in the bill. In no other way can I explain, why S. J. Horn should demand that the contract should be reduced to writing, and why the most important part of this contract as stated by the plaintiff was thus reduced to writing; and in no other way can I account for the Star Foundry Company by its president signing the memorandum of sale of the carriage factory lot for two hundred and fifty dollars, probably not a fourth of its value. I shall decline to consider whether the Star Foundry Company would have been justified in refusing to fulfil its written contract, because the terms of it were not, as it claims, complied with in sixty days. The whole conduct of the company shows that they were equally guilty with S. J. Horn in these fraudulent arrangements and contract; and the reason the contract is not enforced against the company is not consideration for it, but only because the public interest demands that such fraudulent contracts should not be enforced by the court.

I have said but little about T. J. Horn, the plaintiff in this suit; I have said nothing about him, because he is but the nominal plaintiff, the real plaintiff being S. J. Horn. The evidence shows, that he had nothing whatever to do with the making of the contract, which he is seeking to enforce; and that in point of fact he never heard of it in all probability, till after it was reduced to writing and signed. And it may

well be doubted whether he knows anything of it now or anything about this suit. He had given to his brother, S. J. Horn, a power of attorney with almost unlimited powers and made irrevocable on its face, whereby he could deal with his real estate in West Virginia or Ohio in any manner he might please, sell and convey it or give deeds of trust upon it at his pleasure. But the evidence fails to show that T. J. Horn, the plaintiff, has any real estate, or any other property, either in West Virginia or Ohio except such real estate as belonged to S. J. Horn and had been with fraudulent purposes conveyed to T. J. Horn, S. J. Horn having by this irrevocable power of attorney a right to sell and convey or borrow money upon or give deeds of trust upon this land standing in the name of T. J. Horn. This seems to me to be an obvious scheme of S. J. Horn's, whereby he has put other of his lands, as he proposed to put this carriage factory lot, beyond the reach of his creditors, while by this irrevocable power of attorney he continued to have complete control over his property thus fraudulently made to appear as if it was owned by his brother, T. J. Horn. I cannot see how T. J. Horn having executed this power of attorney with this fraudulent purpose can have any standing in a court of equity more than his fraudulent brother, S. J. Horn, or the equally fraudulent Star Foundry Company.

While the circuit court ought to have dismissed the bill in this cause on demurrer instead of overruling the demurrer, yet, as on the final hearing it dismissed the bill at the plaintiff's costs, none of the parties have a right to complain of its action; and therefore its final decree of April 14, 1882, must be affirmed; and the appellees must recover of the appellant their costs and thirty dollars damages.

AFFIRMED.