## Comstock v. Draper.

A. and B. made their promissory note, payable to the order of C., at the Farmers' and Mechanics' Bank at Pontiac, and C. and D. endorsed the note in blank, and it was then discounted by the bank for the makers. Afterwards a judgment was obtained on the note against D., in the name of the bank, and E. was appointed receiver of the bank by the court of chancery. E. took a new joint and several note from C. and D. to himself, in part payment of the judgment, which last note was transferred to defendant after it became due, and the law under which the bank was organized, commonly called the general banking law, was subsequently adjudged to be unconstitutional. *Held*, That the illegality of the original transaction affected the new note, which was void, as there was no new consideration.

ERROR to Oakland Circuit Court. Charles Draper sued Comstock in the circuit court, and declared in assumpsit on a joint and several promissory note, made by Comstock and Asa B. Hadsell, on the 19th October, 1840, for $70 91, payable to William Draper or order, and endorsed by him to the plaintiff. The defendant put in a plea, stating that Orison Allen and A. S. Allen, on 11th April, 1838, made their promissory note for $100, payable in ninety days to the order of Comstock, the defendant, at the Farmers' and Mechanics' Bank, at Pontiac, which note was endorsed in blank by Comstock and Asa B. Hadsell, and then discounted by the bank for the makers. That after the note became due, a suit was brought by the bank against Hadsell as endorser, and a judgment obtained against him by the bank, on the 15th October, 1839, for $110 29 damages. That on the 19th October, 1840, the defendant and Hadsell gave the note on which the present suit was brought, to William Draper, who was then receiver of the Farmers' and Mechanics' Bank, under an order of the court of chancery, in part payment of the aforesaid judgment. That after the note became due, and on or about the 20th October, 1840, William Draper endorsed it to the plaintiff. That the Farmers' and Mechanics' Bank was organized under an act of the legislature of the state, entitled "An act to organize and regulate banking associations," approved March 17, 1837, and that the bank never had a legal existence. To this plea the plaintiff demurred, and the defendant joined in demurrer; and the demur-

rer having been sustained by the court below, and judgment rendered for the plaintiff, the defendant sued out a writ of error to this court, where the cause was argued by

*Stevens,* for the plaintiff, in error.

· *Draper,* in person.

*By the court,* WING, J.  As the case is presented by the pleadings, the defendant in error must be held to stand in the same position with the payee of the note, and hold the note subject to the same defence that could have been made to it in the payee's hands.  This results from his having received the note after it was past due.  He is affected by all the equities between the original parties, whether he have notice thereof or not.  Story on Bills, 197.

It is conceded that the law under which the Farmers' and Mechanics' Bank of Pontiac was organized, was unconstitutional, and therefore the bank had no legal existence.  This was fully settled in the case of Green *v.* Graves.  In that case, suit was brought by the receiver of the Bank of Niles, on a note given to the bank.  The receiver was not permitted to recover: as his principal, or the institution which he represented, could not recover, he could not.

In this case the note was given to William Draper, and was made payable to him or his order, but it was in fact made to him in his representative capacity, because he was receiver, and in payment or discharge of a debt due to the so-called Farmers' and Mechanics' Bank of Pontiac, and for no other consideration: he appears not to have had any interest in the note, except in his character of receiver.  He could not have owned the judgment, for, being in the name of the bank, there were no means of making a legal assignment: whatever may have been the force and effect of the judgment, standing in the name of the bank, there was no legal person with whom William Draper could contract for it.  Then the consideration of the note being the judgment or the debt evidenced by it, could William Draper, as receiver—the representative of the bank—make a more binding contract with the debtors of the bank, than his principal could make?  I do not now speak of the consideration of the note; I simply put the matter upon the basis of power, or want of power in the receiver to do

what the bank could not do; and it appears to me the answer must be in the negative.

That the original note was void, because it grew out of a transaction with an illegal bank, and because the consideration of the note was illegal, cannot be disputed, since the late decisions of this court, and particularly the decision in the case of Hart *v.* The Michigan State Bank.* The original parties were *particeps criminis* and *in pari delicto.* If the suit on the original note had been defended on the ground that the consideration of it was entirely an illegal currency, and paid in furtherance of an illegal object, no judgment could have been recovered upon it; at the least, as the law is now understood to be, and as it is stated in the case cited, and also in the cases of the State of Michigan *v.* How *et al.,* and McReynolds *v.* Goddard *et al. Vide* Appendix. It was held in those cases, that *ex turpi contractu, non oritur actio.*

But it is insisted that the judgment was valid, and could not be impeached, and therefore constituted a good and legal consideration for the note; that no defence can be made to this note, which could not have been made to a suit on the judgment.

It is not quite easy to understand this doctrine as applied to this case, for it must be admitted that no suit could have been brought upon the judgment. There was not and could not be any person competent to sue. As to the general rule in relation to the force and effect of a valid judgment, there can be no doubt; and it perhaps may be conceded, that if a judgment should be recovered upon a note to which fraud might have been a defence, and the judgment debtor, with full knowledge of the fraud, should give a note for the amount of the judgment, he could not contest the note upon any grounds; at all events, not upon the ground of fraud, merely personal to himself, and in which the public are not interested.

But the question now presented is one involving the *illegality* of the original note. It is not held to be void for the good of the makers, or on account of any merit in them, but on the ground of public policy, to protect the public against the violation of a positive statute.

It is a well settled doctrine in the English and American books, that

* This case is not in the possession of the reporter. It will be published in the next volume.

an illegal transaction cannot constitute a good consideration for a promise. If the connection between the original illegal transaction and the new promise can be traced, if the latter is connected with and grows out of the former, no matter how many times and in how many different forms it may be renewed; it cannot form the basis of a recovery, for repeating a void promise cannot give it validity.

In this case, no new element has entered into the new promise. The parties are substantially, and in law, the same. The consideration is the same, and the parties all have actual or constructive notice. The original unsoundness of the debt has flowed down to and is incorporated into the new promise. But it may be said the stream has been purified in its passage; that the judgment has purged the original taint, and the note is no longer connected with and does not grow out of the original illegal contract, but grows out of the judgment. Is this true? The judgment can scarcely be said to have purified the stream: it may have dammed it, and stopped the continuous flow of the current, for the period the judgment existed as a judgment; but when the judgment was discharged, the dam was removed, the impurities of the fountain again flow on, and are carried along by the current, and mingle with the new promise.

If we give all the effect that can be claimed for a judgment, and if we assume that it could not have been impeached by any proceeding at law or in equity; that the position of the plaintiffs in the judgment was impregnable so long as they maintained it, and their judgment was kept in full force; yet if their position was voluntarily surrendered by a discharge of the judgment, and their rights were deprived of the protection which the law had given to them, and a new note was taken for the original, or a part of the original indebtedness, without any new consideration, can they complain that it should be held subject to the same defence which might have been made to the original note? If the judgment could be said to have imparted to the debt any support, did it not pass away with that by which it was sustained? I think it did. Considerations and principles of a higher character than such as would be applicable to the case of a private fraud (cited above) must prevail.

I was somewhat puzzled, at first, to discover how the effect claimed for the judgment was to be obviated; but on looking into the decisions

of the King's Bench, I think it will be found that no insuperable barrier is presented by the judgment.

In the case of Ribbans v. Crickett, 1 Bos. and Pul. 264, plaintiff furnished victuals to voters, which was unlawful. On being sued, defendant paid money into court, but the court would not allow it to be applied in payment of the illegal contract. Here the payment of money into court was an admission of every cause of action, either well or ill pleaded, which could be the subject matter of a promise. This was a subsequent promise in effect, and of the most binding character; for paying money into court enures to the benefit of the plaintiff, even in cases where there is no consideration.

In Aubert v. Maze, 2 Bos. and Pul. 371, plaintiff had paid the difference in certain unlawful insurances, after the transaction was passed, and sued for the balances, and though arbitrators awarded a sum due, the court set aside the award. Lord Eldon held there was no difference between paying the money generally in the adventure, and paying at the express request of the defendant. That being one remove from the illegal transaction, does not alter its nature; it is still connected with it.

In the case of George v. Stanley, 4 Taunton 683, defendant lost money at play, and gave notes for it, which were passed to the plaintiff by the payee. They fell due, and he gave the plaintiff other notes in lieu thereof, and being unable to meet these, he confessed a judgment, execution was issued, and the money was made. After all this, the court suffered an issue to be made, to see if the plaintiff could be implicated or charged with notice.

In De Begnis v. Armistead, 10 Bingham 107, plaintiff and defendant carried on a theatre in London, which was unlicensed: plaintiff was to pay certain matters, and defendant certain other specific expenses. Plaintiff paid, at the request of defendant, several sums for him. After the whole transaction was ended, a settlement was made, and defendant gave his acceptance for the sum due. Held, that as the debt originated in illegality, the subsequent settlement and acceptance were illegal and void.

These cases show that courts have gone far to sustain a defence to an illegal contract, or a contract remotely connected with the illegality, if it spring from or is based upon it. A plaintiff is not permitted to get

into court through an illegal contract. The court will not in any way aid a guilty party. The contract is still executory.

If I am correct in these views, the conclusion follows, that plaintiff in error should have judgment upon the demurrer.

*Judgment reversed.*