# CHARLESTON.

HAYMOND, ADMR. V. HYER *et als.*

Submitted May 1, 1917.    Decided May 22, 1917.

1. EXECUTORS AND ADMINISTRATORS — *Sale of Land — Interest of Executor.*

An executor can not lawfully acquire an interest, either directly or indirectly, in a sale of land made by him in his representative capacity. (p. 598).

2. CONTRACT—*Sale by Executors—Secret Trust in Favor of Executor.*

A contract between an executor and a purchaser of land sold by the former, to purchase the land jointly, the latter to take and hold the title in secret trust for both, is against public policy and fraudulent in law, and the courts will refuse to enforce any of its provisions or any subsequent contract between the parties founded thereon, or to grant any relief in respect thereto at the suit of either party, but will leave the parties where they placed themselves. (p. 598).

3. SAME—*Contract Based on Prior Illegal Contract—Legality.*

A new contract founded on a prior illegal one, can not be made legal. (p. 601).

4. SAME—*Executors and Administrators—Suit—Proof of Illegality.*

In a suit founded on an illegal contract, the defendant, if he is living, or his personal representative, if he is dead, may plead the facts showing its illegality. (p. 603).

Appeal from Circuit Court, Braxton County.

Suit in equity by W. E. Haymond, as administrator of J. S. Hyer, deceased, against Geo. E. Hyer and others, heirs, and A. W. Corley, with cross-bill by defendant Corley, and with replications and answers thereto by plaintiff and part of the heirs. Demurrer and exceptions to such replications overruled, and final decree denying defendant Corley any relief, and he appeals.

*Affirmed in part. Reversed in part. Remanded.*

*Alex Dulin, C. F. Greene, Cary C. Hines* and *R. G. Linn,* for appellant.

*Haymond & Fox,* for appellees.

WILLIAMS, JUDGE:

This suit in equity by W. E. Haymond, as administrator of J. S. Hyer, deceased, was brought against his heirs and creditors for the purpose of ascertaining decedent's debts, determining what interest, if any, defendant A. W. Corley had in certain lands described in the bill and of which said J. S. Hyer died seized, and for the purpose of selling decedent's lands, or a sufficient quantity thereof to pay his debts. The bill avers that some of the lands had been partitioned among the heirs and that other lands had not been so partitioned. As to the latter, it avers they had been conveyed to said J. S. Hyer by apparently absolute deeds, but that the defendant A. W. Corley claimed an equitable interest therein, and plaintiff did not know whether or not his claim was just and desired the court to ascertain and determine that matter. J. S. Hyer died July 7th 1903, and the bill was filed at October rules, 1904. The following January, A. W. Corley filed his answer in the nature of a cross-bill, averring that he was an equal joint owner with said Hyer in a number of tracts of land, to which the latter held the legal title upon secret trust, exhibiting contracts in writing, signed by the latter, evidencing sale by him to Corley of such interest, and also, in most instances, acknowledging payment in full of the consideration therefor, and agreeing to execute deeds to him for his interest when demanded. No deeds appear ever to have been executed. Some of the lands alleged to have been so held in trust were sold by Hyer, and he accounted to Corley for a part, if not all, of his share of the proceeds. The arrangement between them appears to have been in the nature of a partnership for the purpose of speculating in lands, in fact Corley so alleges in his cross-bill. Plaintiff and two of the Hyer heirs filed special replications and answers to the cross-bill, averring that a number of the tracts of land in which said Corley claimed an equitable interest were purchased by said Hyer in pursuance of a collusive and fraudulent arrangement between himself and said Corley, the latter acting as executor of W. L. J. Corley, deceased, whose estate the lands were, or as a commissioner of court, or in both capacities, in making sales thereof to said

J. S. Hyer, deceased, and at the same time being secretly interested in the purchases, and averring that such transactions are fraudulent and contrary to public policy. To the answers Corley filed exceptions and also demurred. On the 18th day of March, 1909, the court sustained his demurrer and exceptions on the ground, stated in the order, that neither party to a fraudulent transaction should be permitted to plead it, and held that the contracts set up in the cross-bill appeared to be valid and binding between the parties to them. But, on the 26th of December, 1913, plaintiff and the Hyer heirs moved the court to set aside its order of March 18th, 1909, and reconsider its former ruling on the demurrer and exceptions taken to their special replications and answers. The motion was taken under advisement, until August 10th, 1915, when the court set aside the former order, overruled the demurrer and exceptions and entered a final decree denying Corley any relief in respect to five certain tracts of land or the proceeds thereof, described as a tract of 331-131/160 acres in Nicholas county, called the Albert Pierson land; 150 acres in Nicholas county, called the W. N. Wilson tract; 1500 acres in Braxton and Nicholas counties, known as the W. L. J. Corley, P. B. Adams and H. A. Holt tracts; and two other tracts, one of 108 and the other 140 acres, both in Nicholas county, and known, respectively, as the John S. and James W. Canfield tracts; and also denied him credit for $1,060 for which he held a receipt signed by J. S. Hyer, which stated that it was to be a credit upon a note for $3,530, which Corley had executed to said Hyer. This decree was not made on the pleadings alone, but it recites that the case was heard upon former orders and decrees, depositions and exhibits filed.

From that decree Corley has appealed, assigning as error the refusal of the court to grant him any relief in respect to his interest in the tracts of land above mentioned, and denying him credit for the $1,060, paid to said J. S. Hyer in his lifetime.

The above-mentioned tracts of land were all carved out of a tract of 3066 acres, formerly owned by W. L. J. Corley, P. B. Adams and H. A. Holt, who had sold the smaller tracts, in the lifetime of W. L. J. Corley, to Albert Pierson, William

Wilson and the two Canfields. All the purchase money for these small tracts had not been paid at the death of W. L. J. Corley, and after A. W. Corley had qualified as his executor, he brought suits in his representative capacity against the several purchasers, to enforce liens for the purchase money. In every case the land was sold under a decree of the court, J. S. Hyer becoming the ostensible purchaser. Shortly after each of his said purchases, sometimes within two or three months and sometimes longer, said Hyer executed to A. W. Corley writings signed by himself, stating that he had sold an undivided half, or other interest as the case might be, in the particular tract to him, and stating also, in nearly every instance, that Corley had paid him in full for such interest. In one or two instances such writing bears date after the time when Hyer had sold most of the tract to some third person, thus indicating a recognition of Corley's interest as existing at the time of the purchase. In making the sales to Hyer, Corley not only represented the estate of W. L. J. Corley, deceased, but acted as commissioner of the court, either singly or jointly with another. That Hyer and Corley were jointly interested in all of the aforesaid purchases sufficiently appears from the pleadings and documentary evidence, especially respecting the 1500 acre tract. It was sold privately, by written contract dated the 26th of May, 1892, signed by Adams, Holt and A. W. Corley, executor of W. L. J. Corley, deceased, and also by J. S. Hyer. The tract was then supposed to contain 1300 acres, and the price Hyer had agreed to pay was $2.00 per acre. The contract recites that $3,000 in cash was paid, $1,000 of it to each of the three vendors, who were equal joint owners. On the back of the contract is a writing, proven to be in the handwriting of Corley, signed by J. S. Hyer in his own proper hand, bearing date on the next day, May 27, 1892, which states that said Hyer had sold an undivided half interest in the tract to A. W. Corley, and that Corley had paid him $1,-500 in cash, and was to pay him one-half the remainder of the purchase price of the tract when Hyer himself had paid the vendors. The original contract stipulated that Hyer was to pay the balance of the purchase price of $2.00 per acre, as

soon as the quantity of land could be ascertained and a deed made. For some unexplained reason Hyer executed to Corley under date of September 24, 1892, another writing selling him the same interest in the same tract of land, acknowledging payment therefor in full, stating that the tract contained 1500 acres and agreeing to execute to Corley a deed for his one-half without waranty, whenever he should demand it. Hyer also expressly reserved the right to sell, at the price of $50, the one-third of 75 acres, which was not included in his deed, which he described as the land on which Martin Mollohan lives, and promised, in consideration thereof, to pay Corley $25, with interest thereon ''from the 26th day of May, 1892.'' Why this reservation of right to sell land which had not been conveyed, and agreement to divide the price with Corley, and why the agreement to pay him interest from the very day on which Hyer became the purchaser, if he and Corley were not joint purchasers? When A. W. Corley entered into this transaction he was representing the estate of his testator in the one undivided third of the land, and when he emerged from it he claimed to be the secret owner of the undivided half. The documentary evidence fully proves, we think, that J. S. Hyer, deceased, and A. W. Corley were jointly interested in the purchases made by the former in all the aforementioned tracts of land.

By his cross-bill Corley seeks to establish his secret equity in the lands, against Hyer's estate, and, by their answers thereto, his administrator and heirs at law defend by setting up an unlawful contract or arrangement between the intestate and said Corley whereby their respective interests had been acquired. Public policy forbids one, who is acting in a representative or trust relation, from acting in the dual capacity of seller and purchaser. Neither a trustee, personal representative, nor a commissioner of court can lawfully buy, either directly or indirectly, at his own sale, or a sale procured at his instance of property entrusted to him. *Bailey's Admx.* v. *Robinson,* 1 Grat. 4; and *Howery* v. *Helms,* 20 Grat. 1. "A fiduciary can not make a valid purchase of the trust property, though it be made at a public judicial sale under a decree made in an adverse proceeding." *Newcomb* v. *Brooks,*

16 W. Va. 32. The rule is not limited to trustees and fidu-
ciaries in a purely technical sense, but, as Judge GREEN says
in his opinion, in the case last cited, at page 62: ''The rule
embraces every relation in which there may arise a conflict
between the duty which the purchaser owes the person with
whom he is dealing and his own individual interest.'' Cor-
ley's duty to the estate he represented was to get all out of
the land he could, but the natural inclination of a purchaser
is to buy as cheaply as he can.· Between duty to another and
personal interest, there arises an irreconcilable conflict of
motives. Hence, recognizing human frailty in all matters in-
volving self interest, the rules of law are wisely framed to
avoid any temptation to a fiduciary to depart from his line
of duty, by denying him the opportunity of making profit for
himself. The rule is founded on public policy and, con-
trary to most legal rules, is apparently without any excep-
tions. To say that the party forbidden by it to buy, pur-
chased fairly and paid full value for the property, even more
than others who were present bidding on it were willing to
pay, does not excuse the violation. The rule is absolute and
the law looks not to the consequences when it is violated, but.
the courts will refuse to confirm the sale. The court would
not have confirmed the sales in the present case, if it had ap-
peared that Corley had a secret interest in Hyer's purchase.

That such sales are only voidable at the election of the
party affected and not absolutely void, is no reply to plain-
tiff's answer to Corley's cross-bill. This is not a suit to set
aside the sale, but a suit by Corley to compel performance of
an unlawful contract, made between himself and Hyer in his
lifetime. Hyer died before it had been fully performed and
now Corley is asking the aid of a court of equity to complete
its performance. He says Hyer died holding the legal title
upon a secret trust for both of them, and Hyer's representa-
tive does not deny it, but replies that it was so held in pur-
suance of an unlawful arrangement, and says the parties
should be left where they placed themselves. If Hyer had
lived it is likely the arrangement would have been fully car-
ried out, and perhaps nobody but themselves would have
known it. It may also be true that no one interested was ac-

tually defrauded. But whether the estate of W. L. J. Corley, ·deceased; actually suffered loss is not a matter to be now inquired into, for it is not at all material to the question to be ·decided. The arrangement was as much a fraud in law and just as illegal·as if it had·been saturated with actual fraud. It violates a fundamental rule of law, founded on public policy, and is, therefore, just as harmful as if it had been a violation of law declared by statute. In the administration of civil justice, courts do not recognize grades in fraud. A fraud is a fraud, whether in fact or in law and they all have the same affect upon contracts founded thereon or connected·therewith.

· But it is insisted a party ought not to be allowed to plead his own fraud, nor ought his personal representative be permitted to do so in order to protect his estate. This is ordinarily true, but where both parties to the suit are equally guilty, and a denial of·the right to plead it would cause a greater wrong and injury to the public, the courts permit the fraud to be pleaded. This is done out of public consideration, and not for defendant's benefit. Lord Mansfield in *Holman* v. *Johnson,* 1 Cowp. 341, says: "The objection that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded in general principles of policy which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff, by accident, if I may say so. This principle of public policy is this; ex dolo malo non oritur actio. No court will lend its aid to a man who founds his cause of action upon an·immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the ·cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant; but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter

would then have the advantage of it; for where both are equally in fault, potior est conditio defendentis.''

This is the reason given for the rule in all the authorities. It is a rule adopted to better secure the public against dishonest transactions, and the beneficial results a defendant happens to get from its application follows from the court's refusal to entertain a cause of action founded on an illegal transaction. It matters not whether the suit is brought to enforce some alleged right growing out of the iniquitous contract, or to relieve against some of its provisions, the position of the defendant is the more advantageous, for whenever the illegality is made to appear, it matters not from which side the evidence comes, the disclosure is fatal to plaintiff's case, and not even the most solemn agreement by the defendant to waive the objection could neutralize its effect. Says Justice Swayne in *Coppell* v. *Hall,* 7 Wall. at page 559, and quoted by Mr. Justice Peckham in *McMullens* v. *Hoffman,* 174 U. S. 658; ''The principle extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation.''

A. W. Corley is here the plaintiff, seeking by his crossbill to have certain provisions of the illegal contract enforced, and under the rule relief must be denied him, not because the court is of opinion he is more culpable than the other party to the illegal contract, but simply because the only method of enforcing the rule is to leave the parties where they placed themselves. *McClintock* v. *Loisseau,* 31 W. Va. 865; and Pomeroy's Eq. Jur., sec. 401.

It is no advantage to Corley that the vice of the transaction does not appear from the averments of his cross-bill and the exhibits filed therewith. He may have presented a *prima facie* case entitling him to relief. But the appearance of the vice nullifies its effect. Looking beyond the mere formal sales made in writing by Hyer to Corley, we discover the prior illegal contract between them, whereby the latter was an indirect purchaser with the former from the beginning. The subsequent writings served not only to show Corley's interest, but also to conceal the true character of the transactions, and were executed in furtherance of it. A new

promise can not be made legal if founded upon illegal considerations. 9 Cyc. 562. "He who comes into equity must come with clean hands," is an oft quoted maxim, and applies to a suitor whose alleged rights are founded upon his violation of some equitable principle of conscience, of good faith or of some positive rule of law. Such an one's complaint will not be heard, but the doors of the court will be shut against him *in limine.* Pomeroy, in his Equity Jurisprudence, sec. 401, says: "The maxim is more frequently invoked in cases upon fraudulent contracts." It embraces however all kinds of illegal contracts. The present case is founded upon a contract just as obnoxious as a fraudulent conveyance of one's property to avoid payment of his debts. In the administration of civil justice, courts do not recognize any grades or degrees in fraud. The violation of a rule founded on public policy is as much a fraud in law as if the rule had been enacted by the legislature.

A leading case in this State on the question here under consideration is *Horn* v. *Star Foundry Co.,* 23 W. Va. 522. Judge GREEN there reviews many of the earlier Virginia cases in point, and finds them to be in harmony with his own view of the law. He approves the decisions in *Starke's Ex'or.* v. *Littlepage,* 4 Rand. 368, and *Harris* v. *Harris' Ex'or.,* 23 Grat. 737, two cases cited and relied on by counsel for appellant. In both those cases the plaintiff was allowed to recover, which would seem to be exceptions to the rule. But if we bear in mind that the purpose of the rule is to protect society against illegal contracts by refusing relief to any party to such contract who asks it, we will readily perceive that the decisions in those cases were not exceptions to, but in harmony with the rule. To have refused relief to the plaintiff in either of those cases, would have been equivalent to granting relief to the defendant against his fraudulent contract, whereas a recovery by plaintiff had the effect to leave the parties in the position in which their unlawful contract had placed them. So that, those cases and others like them, are no exceptions to the rule. The difference is only apparent, not real. Says Judge J. W. Green in *Starke's Ex'or.* v. *Littlepage,* 4 Rand., at page 372: "If it be neces-

sary, in order to discountenance such transactions, to enforce a fraudulent contract at law or to relieve against it in equity, it will be done though both the parties are *in pari delicto.*"

To grant the prayer of Corley's cross-bill in the present case would be to assist to carry out the original illegal contract, whereas, by denying him relief the court stamps its condemnation upon it and discourages the making of such contracts in the future. That either party to a fraudulent contract may allege and prove the fraud in defense of a suit brought upon it by the other, is well established. This is allowed even though the plaintiff has established a *prima facie* case entitling him to relief. "Courts of justice will allow the objection that the consideration of the contract was immoral or illegal to be made even by the guilty party to the contract; for the allowance is not made for the sake of the party who raises the objection, but is granted upon general principles of policy." 2 Kent's Commentaries, (14th ed.), 466. Broom's Legal Maxims, (8th ed.) 577; *Standard Lumber Co.* v. *Butler Ice Co.,* 146 Fed. 359, 7 L. R. A. (N. S.) 467, and cases in note; and *Lanham* v. *Meadows,* 72 W. Va. 610.

The maxim, *in pari delicto potior est conditio defendentis* results from the enforcement of the rule, and not from any purpose or design to assist the defendant. He simply happens to be in a more fortunate position, because he is the party sued and not the suitor.

The decree appealed from denied Corley credit for $1,060, for which he holds Hyer's receipt. In that respect the court erred. As to that item the court misapplied the rule, and, in effect, granted relief pro tanto to Hyer's estate. The receipt represented a closed transaction; it was for money paid to Hyer, or retained by him in pursuance of the fraudulent contract, and, to deny Corley credit therefor would be equivalent to allowing Hyer's estate to recover back money which he had paid on the illegal contract. It would not be leaving his estate in the situation in which he had placed it, but would be changing it for the better. Denial of credit to Corley relieved Hyer's estate from a part of the illegal con-

tract which had been fully executed. Hyer's administrator can no more recover from Corley than Corley can recover from Hyer's estate. The receipt is for a portion of Corley's share of the cash payment received by Hyer from the sale of a 2000 acre tract of land, a half interest in which was originally owned by W. L. J. Corley, deceased, and which A. W. Corley, as his executor, sold to Hyer, Corley thereby acquiring a one-third interest in it. Later Hyer sold the whole tract to a third person at $20 an acre, received a cash payment of $6,720, and settled with Corley for his share thereof, in part by his check to Corley for $593, in part by depositing in bank to his credit $250, and the balance by executing his receipt for $1,060. The receipt states that it is a payment on a note for $3,530, which Corley owed to Hyer as guardian for Fannie May Corley. The money should have been applied as per the receipt.

In so far as the decree appealed from denies appellant credit for the $1,060, it will be reversed, and in all other respects it will be affirmed, with costs to appellant.

*Affirmed in part. Reversed in part. Remanded.*