# CHARLESTON.

CARLETON MINING & POWER COMPANY *v.* WEST VIRGINIA. NORTHERN RAILROAD COMPANY

(No. 6240)

Submitted September 12, 1928.  Decided October 2, 1928.

*P. J. Crogan* and *John E. Cupp,* for plaintiff in error.

*Gibson & Mattingly* and *F. E. Parrack,* for defendant in error.

MAXWELL, JUDGE:

The defendant in the above styled action in assumpsit prosecutes the present writ of error to a judgment for the plaintiff in the sum of $9,600.37, being a portion of the amount claimed by the plaintiff to be due to it on a contract of sale between the parties.

The defendant is a common carrier, owning and operating a railroad 10.97 miles in length, extending from Tunnelton, on the main line of the Baltimore & Ohio Railroad, to the town of Kingwood. From a point on defendant's line near Tunnelton a line of railroad 5,612 feet in length, commonly called the Atlantic Branch, extends to the coal operations of the Atlantic Coal and Coke Company. Prior to the year 1919, the plaintiff owned a right of way 4,238 feet in length, connecting with the terminus of the Atlantic Branch and extending to its coal properties. Some time late in that year, negotiations were entered into between the president of the plaintiff and one or two of the officers of the defendant, contemplating the construction of a line of railroad herein referred to as the Carleton extension. The general terms of this agreement seem to have been arrived at "some time between August First and October Twenty-Fifth," 1920; and the construction work began shortly thereafter.

In February, 1921, the defendant made application to the Interstate Commerce Commission, pursuant to the provisions of the federal transportation act, for authority (1) to acquire, rehabilitate, and operate an existing branch extension of its railroad, connecting with its main line near Tunnelton, and extending to the coal mine of Atlantic Coal and Coke Company in Preston County, West Virginia, now known as the Atlantic Branch; and (2) to operate, or engage in transportation over a privately owned extension of the above named Atlantic Branch. At the hearing on the application, in August, 1921, when it became evident that the purpose of the defendant was finally to acquire the Carleton branch, it was the opinion of the Commission not to pass upon the application to operate that branch until it had before it the contract under which the same was to be operated, not then fully formulated. Defendant's counsel then withdrew that portion of the application, and reserved "the right to let stand any evidence taken in support of the necessity for that extension at such times as details can be perfected to take it over." Whereupon the hearing was adjourned.

A second hearing was had September 6, 1922, at which time the defendant amended the part of its application re-

lating to the Carleton branch to read as follows: "To acquire and operate an existing privately owned railroad in Preston County, West Virginia, connected with the western terminus of the railroad mentioned in subdivision (1) hereof," etc. By the terms of the contract on which this action is predicated, the plaintiff, in consideration of one dollar in hand paid, and the sum of $32,416.34 to be thereafter paid to it, undertook to transfer to the defendant the right of way in controversy, together with all improvements thereon, and covenanted to execute contemporaneously therewith a sufficient deed for the property. The defendant agreed to pay to plaintiff, beginning on the first day of February, 1922, and on the first day of February of each year thereafter, a sum equal to twelve and one-half cents for each and every gross ton of coal and other freight transported over the Carleton extension, until the full purchase price of $32,416.34, with interest, was fully paid.

On the defendant's application and the evidence introduced in support thereof, the Commission found that the Atlantic Branch, built in 1902 and 1903 at a cost of $25,706.77, was operated by the Atlantic Coal Company as an industrial siding until the year 1912, when operations ceased; that the coal company rehabilitated the road in 1921, at a cost of $65,346.06; and that the applicant proposed purchasing the property at a price of $91,052.83, the sum of the original and rehabilitation costs; that probably the greater part of the cost of rehabilitation was for replacement of parts of the original construction; that the defendant had an accumulation of loss amounting to more than three times the cost of its road and equipment; and therefore the commission was of opinion that the results of past operation did not justify the addition to its capital account of the large sums proposed to be paid for the Atlantic Branch and the Carleton extension, and the application was denied.

The present action was instituted for the recovery of installments due under the contract of July 10, 1922. The main defense interposed to the action is that this contract is illegal and unenforceable in the absence of a certificate of public convenience and necessity from the Interstate Com-

merce Commission authorizing the defendant to acquire and operate the Carleton extension.

Paragraph 18 of section one of the Commerce Act, added by the Transportation Act of 1920, 41 Stat. L. 477, provides that no carrier by railroad "shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this Act over or by means of such additional or extended line of railroad," until it shall have first obtained from the Commission a certificate of public convenience and necessity authorizing it to do so. Paragraph 22 of said section provides: "The authority of the Commission conferred by paragraphs (18) to (21) inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

It is not questioned that at the time of the final hearing before the Interstate Commerce Commission both the Atlantic Branch and the Carleton extension were employed in interstate commerce.

It is urged on behalf of the plaintiff, first, that a certificate of public necessity and convenience is not necessary as a condition precedent to the acquisition by the defendant of the Carleton extension, because, it is said, the same does not in fact constitute an extension within the meaning of paragraph 18 of section one of the Transportation Act; but that by reason of the fact that the Carleton road is disconnected from the defendant's line (the Atlantic Branch intervenes) the former is not properly to be considered an extension. There has not come to our attention any case in which a similar state of facts has arisen. It seems to us, however, that the purpose of the statute as applicable to an unquestioned and connected extension is likewise applicable here. That purpose is to insure adequate transportation service for the benefit of interstate commerce. *The New England Divisions Case*, 261 U. S. 184, 43 Sup. Ct. 270. One of the essential ele-

ments in effecting such purpose is the regulation of expenditures by railroad companies for new lines and trackage. Whether such proposed extension of line is physically connected with the company's existing lines, or whether it is disconnected therefrom and can be reached only by the use of intervening trackage not owned by the company, the project may be none the less advantageous or disadvantageous as the facts and surrounding circumstances may disclose.

A very comprehensive discussion of the Transportation Act is found in *Texas & Pacific Ry. Co. v. Gulf, Colorado & Santa Fe Ry. Co.*, 270 U. S. 266, 70 Law. Ed. 578. The court there says:

> "* * * Tracks of that character (meaning spur, industrial, team, switching or side tracks) are commonly constructed either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier. The question whether the construction should be allowed or compelled depends largely upon local conditions which the state regulating body is peculiarly fitted to appreciate. Moreover, the expenditure involved is ordinarily small. But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purposes and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad within the meaning of paragraph 18, although the line be short, and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. Being an extension, it cannot be built unless the Federal commission issues its certificate that public necessity and convenience require its construction.

> The Hale-Cement Line is clearly an extension with-
> in this rule.''

Considering the Carleton road in the light of the foregoing statements of the United States Supreme Court, it would seem that we have here plainly an extension and not a spur or industrial side track, for it appears from the evidence that the Carleton road extends from the end of the Atlantic Branch a distance of 4238 feet into new territory not served by any carrier and thus affording an outlet for a large acreage of coal. It involved an ''opening up'' of virgin territory. For the lawful acquisition of said extension, it was therefore necessary for the defendant to obtain from the Interstate Commerce Commission a certificate of convenience and necessity as required by the Transportation Act. As already recited, the defendant did make such application to the Commission and an unfavorable holding by the Commission was the result.

The plaintiff says, however, that the defendant did not act in good faith in the presentation of its application; that it so presented the matter as to invite the unfavorable result which attended its efforts. Whether there was or was not bad faith on the part of the defendant need not be decided. The result must be the same. For even if there was bad faith, the requirements of the Transportation Act cannot thereby be defeated. The act embodies a national policy bearing on the vital matter of adequate railroad transportation for interstate commerce. Can that policy be overthrown or circumvented by the action of a carrier which comes within the express terms of the act? We hold not. To hold otherwise would be to vitiate the act. If the defendant here were held liable on its contract of purchase with the plaintiff, notwithstanding the Interstate Commerce Commission has declined to issue its certificate of approval, because, forsooth, the defendant has not dealt fairly with the plaintiff, there would thereby be given recognition to a procedure which might not only impair the financial stability of interstate carriers, but would also make it possible for the requirements of the Transportation Act in this particular to be defeated in

any case, large or small, by an adjudication of unfairness on the part of an applicant. Disasterous results to the federal policy would result, whether the applicant had in fact been unfair or whether, in a supposed case, such apparent unfairness came about through collusion between interested parties. In such cases, a holding that an estoppel may operate against a party who pleads the Transportation Act would be accompanied by a necessary and consequent corollary that the federal government can thus be defeated in the exercise of its sovereignty in interstate commerce. This would involve a contravention of settled public policy. It cannot be. 7 Enc. Dig. Va. & W. Va. Rep. 268; *Three Star Products Corp.* v. *Ofsa.* 94 W. Va. 636; *Tate* v *Commercial Asso.,* 97 Va. 74, 45 L. R. A. 243; *Camp* v. *Bruce,* 96 Va. 521, 43 L. R. A. 146; *Pullman's Palace Car Co. v. Central Trans. Co.,* 171 U. S. 138.

The federal law is paramount in matters pertaining to interstate commerce. Contracts touching the subject matter thereof are made subject to the requirements of the law. The parties to this action must be deemed to have had its provisions in mind when they made their contract. The law must be read into and with the contract. The law is first, contracts second.

But it is said the defendant has accepted deeds from the plaintiff for the property involved. That cannot affect the result in this action. The contract was not void *ab initio,* but it has become ineffectual because of the action of the federal commission in declining to issue a certificate of convenience and necessiy. Numerous authorities sustain the proposition that the illegality of a contract enters into a subsequent one based thereon and connected therewith. ''Where a contract grows out of, and is connected with, a prior illegal contract, the illegality of such prior contract will enter into the new contract and render it illegal.'' 13 C. J. 509. Also, 6 R. C. L., p. 820; 2 Pom. Eq. Jur. (5th ed.) Sec. 964; *Haymond, Adm'r.* v. *Hyer,* 80 W. Va. 594; *Cox* v. *Grubb,* 47 Kan. 435, 27 A. S. R. 303; *Kennedy* v. *Welch,* 196 Mass. 592; *Comstock* v. *Draper,* 1 Mich. 481, 53 Am. Dec. 78; *Swinney* v. *Edwards,* 8 Wyo. 54, 80 A. S. R. 916.

The same principle is necessarily applicable where a deed

is thus predicated. A deed based on an abortive contract is itself abortive. And again, a deed not valid can not be made the basis of an estoppel. 21 C. J. 1100; 10 R. C. L. 675; *Starr* v. *Long Jim,* 227 U. S. 613; *Wilson* v. *Spencer,* 1 Rand. 76, 10 Am. Dec. 491.

If the defendant has improperly used the plaintiff's property,—the subject matter of this suit,—and has profited therefrom as urged by the plaintiff, the remedy therefor is not in an action on the contract of sale.

For the reasons above set forth, the judgment of the trial court is reversed, the verdict set aside, and the case remanded.

*Reversed and remanded.*