CARLETON MINING & POWER COMPANY *v.* WEST VIRGINIA
NORTHERN RAILROAD COMPANY

(No. C. C. 436)

Submitted January 14, 1931 . Decided June 10, 1931.

*F. E. Parrack* and *J. V. Gibson,* for plaintiff.
*P. J. Crogan, John E. Cupp* and *Carleton W. Meyer,* for defendant.

LITZ, PRESIDENT:

The object of this suit is to cancel a sale and conveyance by plaintiff, Carleton Mining & Power Company, to defendant, West Virginia & Northern Railroad Company, of a railroad extension, and to require an accounting by defendant to the plaintiff for revenues derived from its operation. The case has been certified to test the ruling of the circuit court sustaining a demurrer to the bill.

The bill alleges that the plaintiff is a corporation owning and operating a coal mining plant in Preston County, West Virginia; that the defendant is also a corporation owning and

operating a standard guage railroad in said county extending from its connection with the Baltimore & Ohio Railroad at Tunnelton to Kingwood, a distance of 10.97 miles; that J. H. Weaver, president and sole stockholder of defendant, owns and operates a standard guage railroad, connecting therewith and designated Atlantic Branch, 5612 feet in length; that by verbal contract between the parties, of October 20, 1920, plaintiff agreed to obtain the right of way therefor and construct on behalf of defendant a standard guage railroad, 4238 feet long, connecting with the said Atlantic Branch; that defendant agreed on its part to furnish "the rails and certain other material" and to pay the plaintiff the actual cost of construction in stated installments, at the rate of twelve and one-half cents per ton for all coal or other freight transported over said road; that plaintiff promptly fulfilled its part of the contract, by delivering to defendant, in October, 1921, the completed road, which it has since operated as the Pierce Extension; that a written contract, embodying the terms of the verbal agreement, and fixing the amount to be paid plaintiff by defendant thereunder as $32,416.34, was entered into between the parties July 10, 1922, at which time plaintiff also conveyed the completed railroad to defendant; that defendant having failed to pay plaintiff any of the contract price, plaintiff instituted an action at law against defendant for the recovery thereof in accordance with the terms of the agreement; that judgment, recovered by plaintiff against defendant in said action for $9,600.37, was reversed on writ of error to this Court because the Pierce Extension, in the opinion of the court, constituted a railroad extension within the meaning of the Federal Transportation Act of 1920, and the purchase thereof had not been authorized by the Interstate Commerce Commission as required by said Act; that defendant had induced plaintiff to sell, convey and deliver to it said railroad extension by fraudulently representing that it would promptly endeavor to secure from the Interstate Commerce Commission the required certificate of authority to purchase the property; that said authority had been denied defendant October 21, 1922, solely because of its failure to exercise a bona fide effort to secure the same; that although defendant

had often promised plaintiff to reapply to the Interstate Commerce Commission for such certificate authorizing the purchase, it had failed and refused to do so. The bill also charges a conspiracy and fraudulent design on the part of defendant, its president and vice-president, John H. Weaver and L. G. Ball, to deprive plaintiff of the use of its property without compensation.

The inhibition embodied in the Transportation Act is relied upon as the main ground of demurrer. There is certainly no question, under the allegations of the bill, of the plaintiff's right to have the contract and conveyance cancelled. But its right to an accounting is, at the least, doubtful.

The Interstate Commerce Act as amended by the Transportation Act of 1920 provides, by paragraphs (18) to (22), inclusive, section 1, that no carrier shall undertake the construction of a new line of railroad, or an extension of its line, or acquire or operate any line or extension, *unless* and *until* it shall first have obtained a certificate of public convenience and necessity from the Interstate Commerce Commission, authorizing such action. These sections follow:

" (18) After ninety days after this paragraph takes effect no carrier by railroad subject to this Act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this Act over or by means of such additional or extended line of railroad, *unless* and *until* there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation of such additional or extended line of railroad, and no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.

(19) The application for and issuance of any such certificate shall be under such rules and regulations as to hearings and other matters as the Commission may from time to time

prescribe, and the provisions of this Act shall apply to all such proceedings. Upon receipt of any application for such certificate the Commission shall cause notice thereof to be given to and a copy filed with the governor of each State in which such additional or extended line of railroad is proposed to be constructed or operated, or all or any portion of a line of railroad, or the operation thereof, is proposed to be abandoned, with the right to be heard as hereinafter provided with respect to the hearing of complaints or the issuance of securities; and said notice shall also be published for three consecutive weeks in some newspaper of general circulation in each county in or through which said line of railroad is constructed or operates.

(20) The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. *From and after issuance of such certificate, and not before, the carrier by railroad, may,* without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and *proceed with the* construction, *operation,* or abandonment covered thereby. Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest; and *any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person, acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph (18) of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both.*

(21) The Commission may, after hearing, in a proceeding upon complaint or upon its own initiative without complaint, authorize or require by order any carrier by railroad subject to this Act, party to such proceeding, to provide itself with safe and adequate facilities for performing as a common carrier its car service as that term is used in this Act, and to extend its line or lines; Provided, That no such authorization or order shall be made unless the Commission finds as to such extension, that it is reasonably required in the interest of public convenience and necessity, or as to such extension or facilities that the expense involved therein will not impair the ability of the carrier to perform its duty to the public. Any carrier subject to this Act which refuses or neglects to comply with any order of the Commission made in pursuance of this paragraph shall be liable to a penalty of $100 for each day during which such refusal or neglect continues, which shall accrue to the United States and may be recovered in a civil action brought by the United States.

(22) The authority of the Commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation.''

In the opinion of the *New England Division Case*, 261 U. S. 184, by Mr. Justice Brandeis, it is said: ''Transportation Act 1920 introduced into the Federal legislation a new railroad policy. *Railroad Commission of Wisconsin* v. *Chicago, Burlington & Quincy R. R. Co.*, 257 U. S. 563, 585; 42 Sup. Ct. 232. Theretofore, the effort of Congress had been directed mainly to the prevention of abuses, particularly those arising from excessive or discriminatory rates. The 1920 act sought to insure, also, adequate transportation service. That such was its purpose Congress did not leave to inference. The new purpose was expressed in unequivocal language, and, to attain it, new rights, new obligations, new machinery, were created. The new provisions took a wide range. Prominent among them are those specially designed to secure a fair re-

turn on capital devoted to the transportation service. Upon the Commission new powers were conferred, and new duties were imposed.'' Chief Justice Taft, also speaking for the court in *Dayton-Goose Creek Ry. Co.* v. *United States,* 263 U. S. 456, summarized the purposes of the act as follows: ''The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission, which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for instrastate commerce, to secure a fair return upon the properties of the carriers engaged.''

As already stated, the plaintiff in its effort to secure redress against the defendant first sued on the contract. On writ of error we held that the plaintiff could not recover in such action because the Interstate Commerce Commission had not granted a certificate of public convenience and necessity as required by the transportation act. *Carleton Mining & Power Co.* v. *Railroad Company,* 106 W. Va. 126. The situation now (in the opinion of the Court) is entirely different. The present suit is not based on the contract, so that our observations in that case are not pertinent here. This suit is for cancellation of the contract and the deed and for an accounting.

The general purpose of the transportation act was to stabilize the great transportation systems of the nation. One of the elements of such stabilization is the avoidance of the acquisition by railroad companies of unnecessary lines or extensions or the ill-advised operation of such other lines or extensions. To that end the approval of the Interstate Commerce Commission must be obtained as well for additional operations

as for new acquisitions. The purpose of the statute could be no more subverted by unwarranted operation than it could be subverted by an unauthorized purchase. But here a proper decision does not turn upon either the question of new acquisition or the question of unwarranted operation. It is the simple question of the illegal use by one company of another's property under circumstances alleged by the latter to be fraudulent. If there were anything in the record to indicate that the mining company had gone into contractual arrangements with the railroad company for the sale by the former and the acquisition by the latter of the railroad extension, irrespective of the action of the Interstate Commerce Commission, or to avoid the federal transportation act, or to circumvent the same, then, under familiar principles, the plaintiff would have no standing in a court of equity. *Bank* v. *Bank,* 100 W. Va. 342; *Commonwealth ex rel. Bank* v. *Camp,* (Pa.) 102 Atl. 205. But such is not this case. It is alleged that in its use of the plaintiff's property the defendant has reaped large profits,—fradulently so. It cannot be considered that it was the purpose of Congress that the above quoted provisions of the transportation act should be used as an instrument to protect fraudulent or otherwise improper conduct on the part of any railroad company, or to secure to such company ill-gotten profits. To require the defendant to account for profits, if any, realized by it in its occupation and operation of the plaintiff's property will in no wise prejudicially affect the transportation system of the country. Courts of equity seek to do justice between litigants and will not permit the rights of the litigant to be destroyed by subterfuge. To permit the defendant to be relieved of the necessity of accounting to the plaintiff for profits, if any, realized in the operation of the former's property, would be radically at variance with basic principles of plain justice and would operate to the abortive use of wise congressional legislation. We are therefore of opinion that the plaintiff is not only entitled to cancellation of the contract and deed, but that it is also entitled to an accounting of profits, if any.

The writer cannot concur in the foregoing views and conclusions as to the right of the plaintiff to recover for the

use of the railroad prior to a demand upon defendant for its return.

In the decision of the law action, JUDGE HAYMOND MAXWELL, speaking for the court, stated: "The plaintiff says, however, that the defendant did not act in good faith in the presentation of its application; that it so presented the matter as to invite the unfavorable result which attended its efforts. Whether there was or was not bad faith on the part of the defendant need not be decided. The result must be the same. For even if there was bad faith, the requirements of the Transportation Act cannot thereby be defeated. The act embodies a national policy bearing on the vital matter of adequate railroad transportation for interstate commerce. Can that policy be overthrown or circumvented by the action of a carrier which comes within the express terms of the act? We hold not. To hold otherwise would be to vitiate the act. If the defendant here were held liable on its contract of purchase with the plaintiff, notwithstanding the Interstate Commerce Commission has declined to issue its certificate of approval, because, forsooth, the defendant has not dealt fairly with the plaintiff, there would thereby be given recognition to a procedure which might not only impair the financial stability of interstate carriers, but would also make it possible for the requirements of the transportation act in this particular to be defeated in any case, large or small, by an adjudication of unfairness on the part of an applicant. Disasterous results to the federal policy would result, whether the applicant had in fact been unfair or whether, in a supposed case, such apparent unfairness came about through collusion between interested parties. In such cases, a holding that an estoppel may operate against a party who pleads the Transportation Act would be accompanied by a necessary and consequent corollary that the federal government can thus be defeated in the exercise of its sovereignty in interstate commerce. This would involve a contravention of settled public policy. It cannot be. 7 Enc. Dig. Va. and W. Va. Rep. 268; *Three Star Products Corp. v. Ofsa,* 94 W. Va. 636; *Tate v. Commercial Asso.,* 97 Va. 74, 45 L. R. A. 243; *Camp v. Bruce,* 96 Va. 521, 43 L. R. A. 146; *Pullman's Palace Car*

*Co.* v. *Central Trans. Co.,* 171 U. S. 138. The federal law is paramount in matters pertaining to interstate commerce. Contracts touching the subject matter thereof are made subject to the requirements of the law. The parties to this action must be deemed to have had its provisions in mind when they made their contract. The law must be read into and with the contract. The law is first, contracts second."

In *Hubbard Grocery Co.* v. *John Barton Payne, Director General of Railroads,* 94 W. Va. 273, dealing with that part of the Transportation Act which authorizes the Interstate Commerce Commission to prescribe standard bill of lading, this Court stated: "It should be understood that in determining the questions under consideration we should look not alone to the force of the contract of shipment upon its face, but must also remember that this contract is subject to the Carmack Amendment to the Hepburn Act of Congress, which vests in the Interstate Commerce Commission exclusive jurisdiction over matters pertaining to interstate shipments, with a view of establishing fixed and uniform regulations regarding such shipments. To this end it is held:

(1) Where the carrier has failed to issue to the shipper a bill of lading the contract set out in the standard bill of lading prescribed by the Interstate Commerce Commission will be implied as the agreement between the parties. The law was intended to operate in all cases where a carrier receives goods under an agreement, oral or written, for their transportation to another State. *Adams Express Co.* v. *Croninger,* 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; *W. H. Aton Piano Co.* v. *Chicago, etc. R. Co.,* 152 Wis. 156, 139 N. W. 743.

(2) The parties cannot waive the terms of the bill of lading contract *nor can the carrier by its conduct give the shipper the right to ignore these terms and hold the carrier to a different responsibility from that fixed thereby. Chicago & Alt. R. R.* v. *Kirby,* 225 U. S. 155, 166; *Kansas City Sou. Ry. Co.* v. *Carl,* 227 U. S. 639; *A. T. & S. F. Ry.* v. *Robinson,* 233 U. S. 173, 181; *Tex. & Pac. Ry. Co.* v. *Leatherwood,* 250 U. S. 478; *Ga. Fla. & Ala. Ry. Co.* v. *Blish Milling Co.,* 241 U. S. 190, 197; *Bronstein* v. *Payne, Director General of Rail-*

*roads,* (Md.) 113 Atl. 648; *Wm. F. Mosser Co.* v. *Payne, Director General of Railroads,* 92 W. Va. 41, 114 S. E. 365. As stated by Justice Hughes in the case of *Ga. Fla. & Ala. Ry. Co.* v. *Blish Co., supra,* 'A different view would antagonize the plain policy of the act and open the door to the very abuse at which the act was aimed.' "

In the recent case of *Chesapeake & Ohio Railway Co.* v. *United States of America, Guyandotte Railroad Company, Norfolk & Western Railroad Company, and the Interstate Commerce Commission,* (decided March 9, 1931) the Supreme Court, referring to section 1 (18) and (20) of the act, again said: "Undoubtedly the purpose of these provisions is to enable the commission, in the interest of the public, to prevent improvident and unnecessary expenditures for the construction and operation of lines not needed to insure adequate service."

The plaintiff concedes the general rule that the courts will not grant relief to either party to an illegal contract, but relies upon the exception permitting recovery of property or money, parted with on the faith of the contract, or compensation for its value; and contends that this remedy is permissible especially in cases in which the injured party, as here alleged, has been induced through fraud of the other to enter into the contract. A noted case in point is *Pullman's Palace Car Co.* v. *Central Transportation Co.,* cited. The Central Transportation Company, who owned, operated and leased to railroad companies, sleeping cars, on February 1, 1870, leased to the Pullman Company its entire plant and personal property together with its contracts which it had with railroad companies for the use of sleeping cars and all patents belonging to it, for a period of 99 years at an annual rental of $264,000, payable quarterly. The Transportation Company also agreed not to engage in the business of manufacturing, using or leasing sleeping cars during the life of the contract. The lessee paid the rents regularly until 1885. It then refused to do so, asserting that it was entitled to rescision of the contract or reduction in the rentals. The Transportation Company brought successive actions to recover the installments of rent as the same accrued, in one of

which the Pullman Company pleaded illegality of the contract as being ultra vires the charter of the Transportation Company. The Supreme Court held that the contract was unlawful and void as being beyond the corporate powers of the lessor, and involving an abandonment of its duty to the public; and that no action could be maintained for rents thereunder. *Central Transportation Co.* v. *Pullman's Palace Car Co.,* 139 U. S. 24. The Pullman Company then brought a suit in equity against the Transportation Company to enjoin further actions at law under the contract; and in its bill offered to return to the Transportation Company such of the property covered by the lease as was capable of being returned and to make just compensation for the rest. The bill also prayed for an accounting between the parties. The Pullman Company later resisted the right of the Transportation Company to an accounting. In holding that the Transportation Company was entitled to recover the property then in possession of the Pullman Company and compensation for the remainder, the court said: ''The right to a recovery of the property transferred under an illegal contract is founded upon the implied promise to return or make compensation for it. For illustrations of the general doctrine as applied to particular facts we refer in the margin to a few of the multitude of cases upon the subject. They are substantially unanimous in expressing the view that in no way and through no channels, directly or indirectly, will the courts allow an action to be maintained for the recovery of property delivered under an illegal contract where, in order to maintain such recovery, it is necessary to have recourse to that contract. The right of recovery must rest upon a disaffirmance of the contract, and it is permitted only because of the desire of courts to do justice as far as possible to the party who has made payment or delivered property under a void agreement, and which in justice he ought to recover. But courts will not in such endeavor permit any recovery which will weaken the rule founded upon the principles of public policy already noticed. * * * The basis for a recovery of property or compensation for its value, in cases of illegal agreements, rests upon the implied contract to return it or pay for it, because there is

no right in the party in possession to retain it. * * * Nor can we accede to the view that the Pullman Company is liable for the earnings of the property which it realized by means of putting such property to the very use which the lease provided. It had the right while both parties acquiesced to so use the property. There is no question of trustee in the case. *Root* v. *Railway Company*, 105 U. S. 189, 215. The property was placed in its hands by the lessor and in' accordance with the terms of the agreement. It was not then impressed with any trust according to any definition of that term known to us. Although the title did not pass and was not intended to pass, the lessee did nothing with the property other than was justified by the lease. His liability is based only upon an implied promise to return or make compensation therefor. This implication of a promise would not arise until one or the other party chose to terminate the lease, for the law implies such promise in order only that justice, so far as possible, may be done. So long as neither party takes any objection to the agreement, and both carry it out, there is no room for any differences, and no promise to return the property or make compensation is necessary, and none is therefore implied. The use of the property is lawful as between the parties, so long as the lease was not repudiated by either, and the rent compensates for the use. After the repudiation the promise is then implied, and it is fulfilled by the payment of the value of the property at the time the promise is implied and interest thereon from that time.''

The decision in that case was dictated by plain equitable principles, unfettered by legal inhibitions. The courts are powerless, however, where, as in this case, an Act of Congress forbids action. The Transportation Act, founded upon the commerce clause of the federal constitution which grants to Congress exclusive authority to regulate interstate commerce cannot be evaded, as the bill seeks to do, by alleged fraud on the part of the railroad company. The conduct of the parties can have no place in the administration of an absolute rule of law. I do not think the act may be ignored in any case where according to principles of equity the injured party is entitled to relief which, in the opinion of the court, may be ad-

ministered without injury to the federal transportation system.

In order to secure authority of the Interstate Commerce Commission to purchase the Pierce Extension, it was necessary for defendant to include in its application also a request for authority to purchase the Atlantic Branch owned by its president, J. H. Weaver. The bill charges, as evidence of bad faith on his part, that he fixed an excessive valuation on the Atlantic Branch line in order to induce the commission's refusal. It is, therefore, unnecessary in this case to set aside positive law in order to afford relief to an oppressed litigant, as plaintiff may pursue his remedy against Weaver who, as charged, is largely, if not solely, responsible for the alleged fraud practiced on plaintiff and for the action of the commission in refusing a certificate of public necessity and convenience for the purchase of the Pierce Extension.

The ruling of the circuit court is reversed.

*Reversed and remanded.*